**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/6/26

PROJECT ROUSSEAU, INC.

Plaintiff,

- against -

DAVID J. VENTURELLA, ACTING DIRECTOR OF THE UNITED STATES IMMIGRATIONS AND CUSTOMS ENFORCEMENT, MARKWAYNE MULLIN, UNITED STATES SECRETARY OF HOMELAND SECURITY, TODD BLANCHE, ATTORNEY GENERAL OF THE UNTIED STATES, AND MARCO RUBIO, UNITED STATES SECRETARY OF STATE

Defendants.

**26 Civ. 9602 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

This case involves allegations that a particular group of Afghan nationals (the "Afghan Nationals") is set to be deported from the United States to Pakistan, then delivered into the hands of the Taliban. (See Dkt. No. 1 ("Complaint").)

On November 3, 2026, the Honorable Valerie Caproni, in her capacity as Part I Judge, issued a Temporary Restraining Order requiring Defendants to comply with and adhere to representations made by counsel for the Government asserting that "there are no planned or confirmed chartered or commercial flights for the purposes of deporting Afghan Nationals to Afghanistan or to Pakistan for the duration of this Temporary Restraining Order and that it takes weeks to make such arrangements." (Dkt. No. 8 (the "TRO").)

The case was then assigned to this Court. Presently before the Court is the Government's Opposition to the TRO. (See Dkt. No. 15.)

The Court recognizes that the Government has a strong interest in enforcing its immigration policies. However, the Court is deeply concerned that a hasty resolution of this case as it currently stands may lead not only to legal error but also to grave, irreversible harm prejudicial to the Afghan Nationals. Further, the Supreme Court is currently considering a case that raises many of the same issues present here, which counsels in favor of waiting for guidance from the Supreme Court rather than preemptively rushing to judgment. See Dep't of Homeland Sec. v. D.V.D., No. 26-426 (U.S.).

This Court has a strong interest in resolving disputes on the merits. That is especially so in matters of life and death. Rather than hastily disposing of this case, the Court is persuaded that the more prudent course of action would be to direct Project Rousseau to amend its Complaint to cure the deficiencies identified below so the Court may properly resolve this matter. In the meantime, and as detailed below, the Court will modify the TRO to enjoin the removal of the Afghan Nationals in aid of preserving its jurisdiction.

# I. BACKGROUND

## A. Factual Background

### 1. The Afghan Nationals and the Planned Removal

The Court accepts the uncontested facts stated in the Complaint as true to evaluate whether the TRO should remain in effect. See, e.g., Fed. Hous. Fin. Agency v. Town of Avon, No. 25-CV-240, 2025 WL 3295528, at *2 (D. Conn. Nov. 26, 2025) ("[T]he Court also preliminarily accepts the uncontested facts alleged in the complaint as true for the purpose of evaluating Plaintiffs' preliminary injunction motion."). The Court further takes judicial notice of publicly available news sources and the records of government agencies. See, e.g., Friemoth v. IBTimes LLC, No. 25-CV-4111, 2026 WL 2690036, at *5 n.2 (S.D.N.Y. Sept. 14, 2026); Doe v. Carlton Behav. Health, Inc., No 25-CV-3489, 2026 WL 880639, at *7 (S.D.N.Y. Mar. 31, 2026).

Plaintiff Project Rousseau, Inc. ("Project Rousseau") is a nonprofit organization that provides legal services to asylum seekers. (See Complaint ¶ 3.) As is relevant here, Project Rousseau represents several Afghan nationals (the "Afghan Nationals") who have immigrated to this country – some of whom have cases pending before federal courts. (See id. at 1.)

The Afghan Nationals have been informed that the Government plans to remove them to Afghanistan within the coming weeks – if not sooner. (See id. ¶ 9.) However, public reporting and information possessed by Project Rousseau indicates that representation is not entirely correct. Instead, the Afghan Nationals will first be removed to Pakistan, and Pakistan has been asked – ostensibly by the Government - to then send the Afghan Nationals to Afghanistan via bus across the border. (See id. at 1-2, ¶¶ 9-14.) See also Ximena Bustillo, US Makes Plans to Deport Afghans, Families of Allies to Pakistan, Bloomberg Law (Oct. 26, 2026), https://news.bloomberglaw.com/us-law-week/us-makes-plans-to-deport-afghans-families-of-allies-to-pakistan; Gavin Blackburn, Taliban voices 'serious concern' over US plan to deport Afghans via Pakistan, Euronews (Nov. 2, 2026), https://www.euronews.com/2026/11/02/taliban-voices-serious-concern-over-us-plans-to-deport-afghans-via-pakistan.

The Department of State has stated that there are numerous "[s]ignificant human rights issues" in Pakistan, including:

> unlawful or arbitrary killings; disappearances; torture or cruel, inhuman, or degrading treatment or punishment; transnational repression against individuals in another country; serious abuses in a conflict; serious restrictions on freedom of expression and media freedom, including violence against journalists, unjustified arrests and

> disappearances of journalists, and censorship; restrictions of religious freedom; threats of violence motivated by antisemitism; and significant or systematic restrictions on workers' freedom of association.

Pakistan 2024 Human Rights Report, U.S. Dep't of State (2024), https://www.state.gov/wp-content/uploads/2025/07/624521_PAKISTAN-2024-HUMAN-RIGHTS-REPORT.pdf.

The Foreign Ministry of Afghanistan has expressed serious concerns about the safety of the Afghan Nationals should they be deported to Pakistan. See Blackburn, *supra* (quoting Foreign Ministry Spokesman as stating, "The Islamic Emirate of Afghanistan expresses its serious concern over reports that the United States intends to deport some Afghan refugees to Pakistan who have not yet been able to obtain legal residency documents in that country.")

The Taliban is the *de facto* government of Afghanistan. The United Nations and numerous human rights groups have reported similar human rights abuses committed by the Taliban in Afghanistan "extrajudicial killings, detentions and abuses." Blackburn, *supra*.

Pakistan and the Taliban are currently engaged in armed conflict at the border – across which Pakistan plans to deliver the Afghan Nationals. See, e.g., A.K. Wazir & Ibrahim Shinwari, Pakistan warns Afghanistan of 'unbearable

punishment' as clashes persist along border, Asia News Network (Nov. 2, 2026), https://asianews.network/pakistan-warns-kabul-of-unbearable-punishment-as-clashes-persist-along-border/.

2. The Third-Country Removal Guidance as Applied to the Afghan Nationals

The Department of Homeland Security ("DHS") has issued guidance regarding its procedures for removing immigrants to countries other than those specified in removal orders issued by immigration courts, which this Court will refer to as "third-country removals." See Kristi Noem, Sec'y of Homeland Security, Guidance Regarding Third Country Removals (Mar. 30, 2025) (the "Guidance"). That Guidance sets forth the following procedures for governing third-country removals:

> DHS must determine whether that country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured. If the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien may be removed without the need for further procedures. If the United States has not received those assurances, or if the Department of State does not believe them to be credible, DHS must follow the procedures below.
>
> DHS will first inform the alien of removal to that country. Immigration officers will not affirmatively ask whether the alien is afraid of being removed to that country....
>
> Immigration officers will refer any alien who affirmatively states a fear of removal to U.S. Citizenship and Immigration Services (USCIS) for a

> screening for eligibility for protection under INA § 241(b)(3) and the Convention Against Torture (CAT) for the country of removal.
>
> In cases where the alien affirmatively states a fear, USCIS will generally screen the alien within 24 hours of referral from the immigration officer. This screening may be done remotely. USCIS will determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal. If USCIS determines that the alien has not met this standard, the alien will be removed.
>
> If USCIS determines that the alien has met this standard ..., USCIS will refer the matter to the Immigration Court [either in the first instance or through a motion to reopen, as appropriate] .... Alternatively, ICE may choose to designate another country for removal.

Id.

DHS has reaffirmed its commitment to the Guidance while litigation challenging it has proceeded throughout the federal courts. See Todd M. Lyons, Acting Director, Immigrations and Customs Enforcement, Third Country Removals Following the Supreme Court's Order in Department of Homeland Security v. D.V.D., No. 24A1153 (U.S. June 23, 2025) (July 9, 2025).

The Afghan Nationals are subject to the Guidance because their final orders of removal do not specify Pakistan as the country of removal. (See Complaint ¶ 21.) The Government has neither received assurances from Pakistan that the Afghan Nationals will not be persecuted nor determined whether any such assurances are credible. (See id. at 2.) Further, DHS

has not informed the Afghan Nationals that they will be deported to Pakistan, instead claiming they will be deported to Afghanistan. (See id. ¶¶ 9-14.)

B. Procedural Background

Project Rousseau filed the Complaint on November 2, 2026, alleging that the Government's plan to remove the Afghan Nationals to Pakistan was contrary to the Guidance in violation of the Due Process Clause under the "Accardi Doctrine" and that the Government's plan was arbitrary and capricious under the Administrative Procedure Act ("APA"). (See id. ¶¶ 21-35.) The Complaint names the following individuals as defendants in their official capacities: David J. Venturella, Acting Director of the United States Customs and Immigration Enforcement; Markwayne Mullin, United States Secretary of Homeland Security; Todd Blanche, Attorney General of the United States; and Marco Rubio, United States Secretary of State.

The Complaint requests four forms of relief, asking this Court to:

> 2. Order that the [Afghan Nationals] shall not be removed from the United States to Pakistan or Afghanistan absent further order of this Court;
>
> 3. Grant a temporary restraining order against removing the [Afghan Nationals] to Pakistan and onward to Afghanistan to preserve the status quo pending further proceedings;

> 4. Declare that deportation of the [Afghan Nationals] without proof of the receipt of diplomatic assurances from Pakistan and an assessment of their credibility violates the Accardi Doctrine;
>
> 5. Declare that deportation of the [Afghan Nationals] without proof of the receipt of diplomatic assurances from Pakistan and an assessment of their credibility violates the right to due process under the Fifth Amendment.

(Complaint at 9.)[1]

The Complaint does *not* request this Court to enjoin the execution of the Afghan Nationals' removal orders permanently or on the basis of immigration law; instead, the Complaint requests injunctive relief during the pendency of this litigation to preserve the status quo while the Court evaluates the merits of the requests for declaratory relief. (See id.)

Project Rousseau filed an *ex parte* Motion for a Temporary Restraining Order and Order to Show Cause Regarding a Preliminary Injunction on November 2, 2026. (See Dkt. No. 4.) Judge Valerie Caproni, acting in her capacity as Part I judge, held a hearing the next day, at which the Government appeared.

At the hearing, Judge Caproni expressed concerns about certain aspects of how Project Rousseau pled its Complaint; however, Judge Caproni also noted the grave allegations

[1] The first form of "relief" requested, i.e., "1." is for this Court to "[a]ssume jurisdiction over this matter." (Complaint at 9.)

alleged in the Complaint. The Government represented the following to Judge Caproni:

> counsel had spoken with Mr. Christopher George, Deputy Assistant Director for Enforcement and Removal Operations in Immigration and Customs Enforcement ("ICE"), and that in such conversation, Mr. George represented that ICE had no planned or confirmed chartered or commercial flights for the purposes of deporting Afghan nationals present in the United States to Afghanistan or to Pakistan, at least through the end of this week . . . counsel for the Government further represented that Mr. George had represented to him that ICE arranges charter flights for deporting persons weeks in advance and makes arrangements to deport persons via commercial airline transport also weeks in advance.

TRO at 1-2.

On the basis of the Government's representations, Judge Caproni issued the following TRO:

> IT IS HEREBY ORDERED that Defendants, their officers, agents, employees, representatives, and all persons acting in active concert or participation with them who receive actual notice of this Order are hereby ordered to comply with and adhere to the representations made by Deputy Assistant Director George through counsel for Defendants that there are no planned or confirmed chartered or commercial flights for the purposes of deporting Afghan nationals to Afghanistan or to Pakistan for the duration of this Temporary Restraining Order and that it takes weeks to make such arrangements.
>
> IT IS FURTHER ORDERED that this Temporary Restraining Order shall take effect immediately upon entry and shall expire on Saturday, November 7, 2026, at 11:59 P.M., unless otherwise extended or dissolved by further Order of this Court.
>
> IT IS FURTHER ORDERED that the attorney for the Government must immediately provide a copy of

> this Order to Deputy Assistant Director George, to an appropriate representative of the Department of State, and to any other representative of the Department of Homeland Security who, in the judgment of the Office of the U.S. Attorney, should be notified. . . .
>
> IT IS FURTHER ORDERED that Defendants must file a response to Plaintiff's Motion no later than Thursday, November 5, 2026, at 9:00 A.M.

Id. at 2-3.

The matter was then referred to this Court. The Government filed its Opposition to the Motion for a Temporary Restraining Order on November 5, 2026. (See Dkt. No. 15 ("Opp.").)

## II. **STANDARD OF REVIEW**

"The standard[s] for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical." Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd., 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002). "Plaintiffs seeking a TRO must show that "'(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.'" New York v. Trump, 765 F. Supp. 3d 287, 291 (S.D.N.Y. 2025) (quoting New York v. U.S. Dep't of Educ., 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020)). Where, as here, the

"defendants are . . . federal officers sued in their official capacities, the balance of equities and the public interest merge." Arias v. U.S. Immigr. and Customs Enf't, No. 26-CV-2130, 2026 WL 1785997, at *43 (S.D.N.Y. June 22, 2026) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)). "A showing of irreparable harm is the single most important" consideration. Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (quotation marks omitted).

Under Federal Rule of Civil Procedure 65(b)(4), "an adverse party to a TRO issued without notice may 'appear and move to dissolve or modify the order,'" after which the "'court must then hear and decide the motion as promptly as justice requires.'" Trump, 765 F. Supp. 3d at 291 (quoting Fed. R. Civ. P. 65(b)(4)). "On a motion to dissolve a temporary restraining order, the party that obtained the order bears the burden of justifying continued injunctive relief." Lapa v. JP Morgan Chase Bank, N.A., No. 21-CV-04737, 2022 WL 3290677, at *2 (S.D.N.Y. Aug. 11, 2022) (citing Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 443 (1974)). "A district court need not find proof of changed circumstances in modifying a temporary restraining order . . . but rather applies its discretion in exercising the trial court's inherent power to modify its orders." KDH Consulting Grp. LLC

v. Iterative Cap. Mgmt. L.P., No. 20-CV-3274, 2020 WL 2554382, at *5 (S.D.N.Y. May 20, 2020).

## III. DISCUSSION

The Court first analyzes the Government's arguments that various provisions of the Immigration and Nationality Act ("INA") divest this Court of jurisdiction. The Court next turns to whether to dissolve the TRO and concludes that the TRO should remain in effect for the time being. Finally, the Court *sua sponte* exercises its inherent authority to direct Project Rousseau to amend its Complaint so the Court may properly adjudicate a forthcoming motion for preliminary injunctive relief.

### A. THE INA'S JURISDICTION-STRIPPING PROVISIONS

The Government starts by arguing that various provisions of the INA strip this Court of jurisdiction to hear this case. (See Opp. at 4-15.) The Court notes at the outset that the Supreme Court has recognized that "[w]hen a statute is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review," and that the court has "consistently applied" that principle "to legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction."

Kukana v. Holder, 558 U.S. 233, 251 (2010) (citation and quotation marks omitted). Regardless, the Government's arguments fail.

1. 8 U.S.C. § 1252(g)

The Government first argues that 8 U.S.C. § 1252(g) ("Section 1252(g)") divests this Court of jurisdiction because that provision deprives courts of jurisdiction over "any cause or claim by or on behalf of any alien arising from the decision or action" of the Secretary of Homeland Security to "[1] commence proceedings, [2] adjudicate cases, or [3] *execute removal orders against any alien* under this chapter." (Opp. at 5 (quoting Section 1252(g)) (emphasis in original).) According to the Government, this Court cannot grant the TRO because this case constitutes a challenge to the "execution" of a final order of removal. (See id. at 7.)

The Government cites various cases that collectively stand for the proposition that this Court cannot prevent the removal of the Afghan Nationals. (See id. at 5-8.) But the Government fails to address the gravamen of the Complaint: That the Government has failed to follow its own procedures under the Guidance. (See Complaint ¶¶ 21-35.)

The Government's argument, in the context of the specific allegations in the Complaint, is foreclosed by Supreme Court precedent. The Supreme Court has held that

Section 1252(g) "is much narrower," and instead applies only to the three statutorily enumerated actions the Secretary can take: "'*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 482 (1999) (quoting Section 1252(g)) (emphasis in original). See also Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 19 (2020) (holding Section 1252(g) does not divest federal courts of jurisdiction over "all claims arising from deportation proceedings"); INS v. St. Cyr, 533 U.S. 289, 311 n.34 (1999) (similar); Jennings v. Rodriguez, 583 U.S. 281, 294 (2018) (plurality op.) (Reno "did not interpret [Section 1252(g)] to sweep in any claim that can technically be said to 'arise from' the three listed actions of the [Secretary of Homeland Security]. Instead, we read the language to refer to just those three specific actions themselves.").

Two circuits have held that challenges to third-country removals are not challenges to the "execution" of removal orders that are nonjusticiable by Article III courts. For example, in D.V.D. v. U.S. Dep't of Homeland Sec., 192 F.4th 74 (1st Cir. 2026), the court reviewed a challenge to third-country removals under the Guidance. See id. at 81. The court there held that, to the extent that the plaintiff class did not contest their removability but instead sought "a

declaration that its members cannot lawfully be removed to third countries, as permitted by [8 U.S.C.] § 1231(b), without first being provided effective notice and a meaningful opportunity to raise fear-based claims concerning those countries," Section 1252(g) did not apply. Id. at 88 (emphasis in original). The Court reasoned that a "claim directed at DHS's adoption of policies involving identification of a country of removal not contemplated by the removal order does not arise from the decision or action to 'execute' that order. If anything, it arises from the decision or action not to execute the country-designation aspect of the removal order when removing class members." Id. (internal citation omitted and emphasis in original). The Ninth Circuit held the same in Ibarra-Perez v. United States, 154 F.4th 989 (9th Cir. 2025), holding that where an immigrant challenged third-country removal under the Guidance, alleging that the Government's lack of adherence to the Guidance violated due process, the immigrant was not challenging "the 'execution' of his removal order." Id. at 997.

So, too, is the case here. To the extent that the Complaint challenges the Government's failure to adhere to the Guidance, that is not a challenge to the "execution" of a removal order that would divest this Court of jurisdiction under Section 1252(g). This case is of a piece with D.V.D.

and Ibarra-Perez, and the Court holds that 1252(g) does not divest the Court of jurisdiction.

2. 8 U.S.C. §§ 1252(a)(5) and (b)(9)

The Government next claims 8 U.S.C. §§ 1252(a)(5) and (b)(9) ("Sections 1252(a)(5) and (b)(9)") divest this Court of jurisdiction. (See Opp. at 8-13.) Not so.

Section 1252(b)(9) states that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." Section 1252(b)(9). And Section 1252(a)(5) provides that the "the sole and exclusive means for judicial review of an order of removal" is a "petition for review filed with an appropriate court of appeals." Section 1252(a)(5).

The Government again collects a series of cases that stand for the proposition that this Court cannot prevent the removal of an immigrant under a final order of removal pursuant to these provisions. (See id.) But "this is not a case that seeks review of an order of removal, the decision to seek removal, or the process by which removability is determined. Rather, this is a case regarding the procedures DHS must follow when, after it decides to remove a person, it

chooses to remove them to a country not identified in the removal order." D.V.D., 192 F.4th at 93. Those sections of the statute are therefore inapposite and do not divest this Court of jurisdiction.

3. 8 U.S.C. § 1252(f)(1)

Finally, the Government invokes 8 U.S.C. § 1252(f)(1) ("Section 1252(f)(1)") to attempt to strip this Court of jurisdiction. (See Opp. at 13-15.) That section provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of Part IV of this subchapter [§§ 1221-1232], other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

Section 1252(f)(1).

The Government rightly concedes that Section 1252(f)(1) does not prevent the Court from granting relief to individual immigrations. (See Opp. at 14.) Instead, the Government attempts to reframe the Complaint by arguing that "Plaintiff does not seek individual relief for itself; rather, Plaintiff seeks injunctive relief for a class of aliens (Plaintiff's Afghan clients)." (Id.)

That reading is incorrect. The Government itself acknowledges that Project Rousseau has identified five individual clients as the relevant Afghan Nationals at issue

in this case. (See id. at 2 n.5; see also Dkt. No. 16 (Declaration of Deportation Officer Imani Montgomery) (discussing the individual facts regarding each Afghan National).) This case is not about a class of individuals, but about five individuals themselves. Section 1252(f)(1) expressly allows injunctive relief with respect to "individual alien[s]" – exactly the people at issue here. The Court concludes that under Section 1252(f)(1) it is not divested of jurisdiction to adjudicate the underlying dispute.

B. VENUE

The Government briefly disputes whether venue applicable to this litigation is proper in this District and proffers the Declaration of a Deportation Officer purporting to provide facts related to the Afghan Nationals' present locations. (See Opp. at 2 n.1, 8; Dkt. No. 16). The Court need not address those concerns here, especially on this limited record. "Any venue concerns can be addressed at a later date since venue is a matter of convenience, not a jurisdictional bar." Common Cause v. Dep't of Homeland Sec., --- F. Supp. 3d ----, 2026 WL 3043900 at *12 n.20 (S.D.N.Y. Oct. 12, 2026); see also Moreno-Bravo v. Gonzales, 463 F.3d 253, 258 (2d Cir. 2006) (explaining, where immigrant challenged removal, that "venue in the federal courts is a

concept of convenience, not a jurisdictional mandate" (citation and quotation marks omitted).

C. PRESERVING THE TRO

1. Irreparable Harm

The Court begins by analyzing whether the Complaint has alleged a likelihood of irreparable harm because that showing "is the single most important prerequisite" to granting – and keeping in place – a temporary restraining order. Wabtec Corp., 559 F.3d at 118 (internal quotation mark omitted).

The risk of religious persecution or torture, even absent "individualized evidence concerning the specific threats each" Afghan National faces, is sufficient to demonstrate irreparable harm necessary to warrant the continued enforcement of the TRO. Devitri v. Cronen, 289 F. Supp. 3d 287, 297 (D. Mass. 2018). As Judge James Boasberg found in a recent case involving similar issues, "the risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm." J.G.G. v. Trump, 772 F. Supp. 3d 18, 42 (D.D.C. 2025).

This case is no different. The Complaint more than adequately alleges that the Afghan Nationals face a likelihood of irreparable harm if deported from this country and transported to Pakistan to be turned over to the Taliban. The Afghan Nationals, according to the Complaint, face a

"grave risk of persecution, torture, and death," by being deported to Pakistan, where they face the risk of religious persecution. (Complaint at 3, 6 & n.3.) Those risks are compounded by Pakistani Government's plan to then hand over the Afghan Nationals to the Taliban. (See id. at 2-3, 7.) The United Nations and numerous human rights groups have reported "extrajudicial killings, detentions and abuses" committed by the Taliban in Afghanistan. See Blackburn, *supra*.

The Complaint adequately alleges irreparable harm, justifying the continued enforcement of the TRO.

2. Likelihood of Success on the Merits

The Complaint also sufficiently alleges a likelihood of success on the merits by alleging that the Government has violated its own regulations, acted in an arbitrary and capricious manner, and deprived the Afghan Nationals of the protections of the Due Process Clause.

To start, it is black letter law under United States ex rel. Accardi v. Shaghnessy, 347 U.S. 260 (1954) and its progeny, that "agencies are generally required to follow their own regulations." Velesaca v. Decker, 458 F. Supp. 3d 224, 236 (S.D.N.Y. 2020) (quoting Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons, 954 F.3d 118, 130 (2d Cir. 2020)). "When agencies fail to do so, the APA (as developed by case law) gives aggrieved parties a cause of action to

enforce compliance." Fed. Defs., 954 F.3d at 130. This principle is grounded not only in administrative law but is further "premised on fundamental notions of fair play underlying the concept of due process." Montilla v. INS, 926 F.2d 162, 167 (2d Cir. 1991). These principles take on particular importance "[w]here the rights of individuals are affected. . . ." Morton v. Ruiz, 415 U.S. 199, 235 (1974).

Accardi and its progeny apply with equal force to regulations related to the enforcement of immigration laws. See, e.g., Pelliccioni v. Joyce, No. 26-CV-7127, 2026 WL 3016462, at *3 (S.D.N.Y. Oct. 7, 2026). Indeed, Courts routinely grant relief to individuals facing immigration consequences "based on findings that" government agencies have "violated the Accardi doctrine" by failing to comply with their own immigration policies. Id. (collecting cases).

Here, the Complaint adequately alleges that the Government has failed to comply with its own regulations, to wit, the Third-Country Removal Policies. (See Complaint ¶¶ 22-27.) Those policies require the Government to either (1) receive adequate assurances from the third country to which the Government plans to deport immigrants that those immigrants will not be persecuted and tortured, deem those assurances to be credible, and share those assurances with ICE; or (2) if the Government does not deem those assurances

credible, the Government must notify the immigrant of their removal to that third country and allow immigrants who state fears of removal for screening for eligibility for protection under INA § 241(b)(3) and the Convention Against Torture. See Third-Country Removal Policies; see also D.V.D., 192 F.4th at 82.

As alleged in the Complaint, the Government has failed to comply with either of the Third-Country Removal Policies' requirements. (See Complaint ¶¶ 22-27.) The Government's failure to comply with its own policies would violate the Accardi Doctrine and the Due Process Clause. See, e.g., Accardi, 347 U.S. 260l; Velesaca, 458 F. Supp. 3d at 236; Fed. Defs., 954 F.3d at 130; Montilla, 926 F.2d at 166; Ruiz, 415 U.S. at 235; Pelliccioni, 2026 WL 3016462, at *3. The Complaint thus demonstrates a likelihood of success on the merits, requiring further enforcement of the TRO.

The Government argues that Project Rousseau lacks standing to litigate the underlying dispute, so it cannot demonstrate a likelihood of success on the merits. (See Opp. at 15-20.) But the gravamen of this case deals with the Afghan Nationals and the potential harm they face if removed as alleged. The Court has little doubt the Afghan Nationals have standing. As discussed below, the proper course is to allow Project Rousseau to join the Afghan Nationals as plaintiffs

and amend their Complaint, rather than dismiss this case out-of-hand. The Court declines to allow a readily curable defect in the pleadings to send the Afghan Nationals to their torture or death in a third country.

3. Balance of Equities and Public Interest

The balance of equities and the public interest also strongly favor the continued enforcement of the TRO. As noted above, those considerations merge where, as here, Government officials are being sued in their individual capacities. See, e.g., Arias, 2026 WL 1785997, at *43; Nken, 556 U.S. at 435.

To be sure, there is "a public interest in prompt execution of removal orders[.]" Nken, 556 U.S. at 436. However, "that interest is diminished when, among other things, the public is not in particular danger" and "there is little additional harm to the public by temporarily preventing" the removal of immigrants while the Court evaluates the weighty concerns raised by this case. J.G.G, 772 F. Supp. at 43.

Further, "'[t]here is generally no public interest in the perpetuation of unlawful agency action' and 'there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.'" Lopez v. Trump, No. 25-CV-4826, 2025 WL

3274224, at *9 (S.D.N.Y. July 10, 2025) (quoting League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016)). Furthermore, "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." Nken, 556 U.S. at 436; see also Lopez, 2025 WL 3274224, at *9 (balance of equities and public interest favored TRO where there was no evidence that individuals in detention posed "flight risk or danger to the community"). It is also in the public interest to require that government agencies and offices comply with their lawful procedures. See, e.g., NAACP Legal Def. & Educ. Fund, Inc. v. U.S. Dep't of Hous. & Urb. Dev., No. 07-CV-3378, 2007 WL 4233008, at *12 (S.D.N.Y. Nov. 30, 2007) ("Both government agencies and the public are best served when agencies operate transparently, and within the confines of established law.").

Accordingly, the Court concludes that the balance of the equities and the public interest decidedly weigh in favor of continued enforcement of the TRO.

* * *

In sum, the Complaint adequately alleges irreparable harm absent continued enforcement of the TRO, there is likelihood of the Afghan Nationals' success on the merits,

and the balance of equities and the public interest strongly weigh in favor of continued enforcement of the TRO. The Court, therefore, holds that the TRO is proper and should remain in effect, except as modified below.

## IV. AMENDMENT OF THE COMPLAINT

"The purpose of a temporary restraining order is to preserve an existing situation *in [status] quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." Garcia v. Yonkers Sch. Dist., 561 F.3d 97, 107 (2d Cir. 2009). The Second Circuit has a strong "preference that litigation [of] disputes be resolved on the merits[.]" Cody v. Mello, 59 F.3d 13, 15 (2d Cir. 1995); see also Sanchez v. Garcia, No. 24-CV-2588, 2026 WL 3033681, at *2 (S.D.N.Y. Oct. 9, 2026) (collecting cases).

The Court seeks to preserve the status quo to ensure the Afghan Nationals are not subject to torture - or worse - pending the outcome of this litigation. However, the Court cannot, at this juncture, resolve a request for a preliminary injunction because of numerous curable defects in the Complaint.

This Court has the inherent power to "manage its proceedings, vindicate its authority, and effectuate its decrees." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 380 (1994). That power extends to the Court's ability to

*sua sponte* order a plaintiff to amend its Complaint to ensure the resolution of a dispute on the merits. See, e.g., Taylor v. Henson, No. 25-CV-4867, 2026 WL 915455, at *3-6 (S.D.N.Y. Apr. 3, 2026); Johnson v. Rose M. Singer Ctr., No. 22-CV-2410, 2022 WL 1782171, at *8 (S.D.N.Y. May 31, 2022); Phipps v. City of New York, No. 17-CV-6603, 2019 WL 4274210, at *4 (S.D.N.Y. Sept. 10, 2019); Nevelle v. N.Y.S.D.O.C.S., No. 05-CV-4071, 2005 WL 2305005, at *4 (E.D.N.Y. Sept. 21, 2005).

The Court exercises that discretion here and *sua sponte* directs Project Rousseau to amend the Complaint to cure the deficiencies identified by Judge Caproni during the November 3, 2026 hearing and as further detailed below.

First, the Court has concerns about whether Project Rousseau itself has standing to bring this lawsuit. However, the Court notes that the Afghan Nationals likely have standing because, as "person[s] suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," they are "entitled to judicial review" under the APA. 5 U.S.C. § 702. Furthermore, while 8 U.S.C. § 1252(f)(1) limits the ability of district and circuit courts to order injunctive relief, that law expressly permits this Court to issue injunctive relief "with respect to the application" of the immigration laws "to . . . individual alien[s] against

whom" immigration proceedings "have been initiated." 8 U.S.C. § 1252(f)(1).

In addition, the Afghan Nationals "*must* be joined as [parties]" because, in their "absence, the [C]ourt cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A) (emphasis added). The Court, further, "*must* order that" the Afghan Nationals, as necessary parties "be made" parties to this dispute, and so orders. Fed. R. Civ. P. 19(a)(2) (emphasis added). Accordingly, Project Rousseau is directed to amend its Complaint to join the Afghan Nationals as individual plaintiffs, whether in a class or mass action. Further, Project Rousseau is directed to amend the Complaint to detail the individual facts specific to each Afghan National so the Court may evaluate whether the Government has violated the Accardi Doctrine or violated the Due Process Clause with respect to each of the Afghan Nationals.

The Court does not take a position as to whether the Afghan Nationals should be joined in a class action or as individual plaintiffs in a mass action. The Court notes, however, that this nation has a long history of immigrants challenging policies in either form. See, e.g., Ex parte D'Olivera, 7 F. Cas. 853 (C.C.D. Mass. 1813) (Story, J.) (relief afforded to Portuguese sailors); Chy Lung v. Freeman, 92 U.S. 275 (1876) (Chinese women detained on steamship);

United States v. Sing Tuck, 194 U.S. 161 (1904) (seventy-two Irish immigrants); In re Tatsu, 10 Haw. 701 (Haw. 1897) (348 Japanese immigrants); In re Ah Ho, 11 Haw. 654 (Haw. 1899) (over 100 Chinese immigrants); Ex parte Toscano, 208 F. 938 (S.D. Cal. 1913) (208 Mexican Federalist Soldiers and followers who fled Mexican Revolution and surrendered to American authorities); Colyer v. Skeffington, 265 F. 17 (D. Mass. 1920) (granting relief to twenty people detained during Palmer Raids).

Second, Project Rousseau is directed to amend its complaint to establish venue in this District. Venue is proper only where a plaintiff alleges what "events or omissions . . . occurred in this District." 28 U.S.C. § 1391(b)(2). At present, The Complaint contains a single, conclusory sentence purporting to establish venue in this District: "Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this District." (Complaint ¶ 2 (citing 28 U.S.C. § 1391(b)(2)).) That statement is insufficient to establish venue. Project Rousseau is directed to amend its Complaint accordingly, including by stating where the Afghan Nationals are currently detained, where they were allegedly told about their removal, where they were domiciled before their detention, where

Project Rousseau is based, or from which airport ICE seeks to fly them to Pakistan.

The Court hereby directs Project Rousseau to amend its Complaint to cure the deficiencies identified above no later than Monday, November 9, 2026, at 11:59 p.m.

## V. MODIFICATION OF THE TRO

This Court has the "inherent power to modify its orders." Trump, 765 F. Supp. 3d at 291 (citation and quotation marks omitted). The Court "need not find proof of changed circumstances in modifying a temporary restraining order." Id.

The Court holds that a slight modification of the TRO is necessary here, especially given recent developments in similar proceedings adjudicated before other courts. See, e.g., Nestle Waters N. Am., Inc. v. City of New York, No. 15-CV-05189, 2016 WL 3080722, at *1 (S.D.N.Y. May 25, 2016) ("Judicial notice may be taken of proceedings in other courts." (citing Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991)), aff'd, 689 F. App'x 87 (2d Cir. 2017).

The Court takes judicial notice that the Government has recently taken actions in other proceedings that have caused immigrants subject to ongoing litigation to be spirited away to third countries. See, e.g., J.G.G. v. Trump, No. 25-CV-766 (D.D.C). Further, the Court takes judicial notice that

the Government has recently taken actions at the eleventh hour that have frustrated courts' abilities to manage their dockets – in possible contravention of representations made by the Government in court. See, e.g., D.C. Pres. League v. U.S. Dep't of the Interior, No. 26-cv-477 (D.D.C.).

This Court further has the inherent power to "manage its proceedings, vindicate its authority, and effectuate its decrees." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 380 (1994). The Court here relies on the representations of Deputy Assistant Director George "that there are no planned or confirmed chartered or commercial flights for the purposes of deporting Afghan nationals to Afghanistan or to Pakistan for the duration of this Temporary Restraining Order and that it takes weeks to make such arrangements." TRO at 2.

As discussed above, the gravamen of the Complaint deals not with the "execution" of the final orders of removal, but instead with the procedures the Government must follow when it chooses to deport the Afghan Nationals to a country not listed on their final orders of removal.

Nonetheless, the Complaint requests that this Court grant a temporary restraining order against removing the Afghan Nationals to Pakistan to preserve the status quo pending further proceedings. (See Complaint at 9.)

To be sure, the jurisdiction-stripping provisions the Government invokes may prevent the Court from enjoining final orders of removal in cases "arising from the decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders," Section 1252(g); in a case involving "review of a final order" under the INA, Section 1252(b)(9); or to a class of immigrants, Section 1252(f)(1).

Those provisions do not, however, bar this Court from exercising its authority to protect its jurisdiction, maintain the status quo, and enforce compliance by Government officials with their own procedures and lawful judicial orders "Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants." Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 927 (D.C. Cir. 1984). As the Supreme Court explained over a century ago, "The use of the writ of injunction, by federal courts first acquiring jurisdiction [over] the parties or the subject-matter of a suit, for the purpose of protecting and preserving that jurisdiction until the object of the suit is accomplished and complete justice done between the parties is familiar and long established practice." Looney v. E. Texas R. Co., 247 U.S. 214, 221, 38 S. Ct. 460, 462, 62 L. Ed. 1084 (1918).

The All Writs Act, 28 U.S.C. § 1651, codifies that authority. Under the All Writs Act, this Court "may issue all writs necessary or appropriate in aid of" its "jurisdiction[]." 28 U.S.C. § 1651(a). That includes the power to issue injunctive relief. Indeed, the Supreme Court has recently exercised the All Writs act to prevent the removal of immigrants for this precise purpose. In A.A.R.P. v. Trump, 605 U.S. 91 (2025), the Government sought to invoke the Alien Enemies Act to remove purported members of a foreign terrorist organization. Id. at 92. The Supreme Court enjoined their removal, noting that it "had the power to issue injunctive relief to prevent irreparable harm to the applicants and to preserve our jurisdiction over the matter." Id. at 97 (citing the All Writs Act).

Under long established principles, enshrined in the All Writs Act, this Court has the power to enjoin the removal of the Afghan Nationals in aid of its jurisdiction over this case. As described below, the Court will modify the TRO to preserve its jurisdiction pending further order of this Court.

The Court therefore modifies the injunction as follows: The Government is enjoined from deporting the Afghan Nationals to Pakistan, Afghanistan, or any other third country pending further order of this Court. The Government

is further directed to notify the Court and Project Rousseau of any plans to deport the Afghan Nationals pending the duration of the litigation no later than one week before any such deportation.

## VI. NEXT STEPS

"The purpose of a temporary restraining order is to preserve an existing situation *in [status] quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." Pan American World Airways, Inc. v. Flight Engineers' Int'l Ass'n, 306 F.2d 840, 842-43 (2d Cir. 1962). The Court seeks to expeditiously rule on the merits of a motion for a preliminary injunction. The Parties are, therefore, directed to file a joint stipulated briefing schedule on a motion for a preliminary injunction no later than Tuesday, November 10, 2026 at 5:00 p.m.

The Court notes that it remains an open question – indeed, one that the Supreme Court is currently reviewing in D.V.D. – whether injunctive relief can be afforded to a class under 8 U.S.C. § 1252(f)(1). However, injunctive relief may be afforded to *individual* immigrants under that section. See 8 U.S.C. § 1252(f)(1); Malam v. Adducci, 452 F. Supp. 3d 643 (E.D. Mich. 2020), as amended (Apr. 6, 2020); Shaik v. Noem, 801 F. Supp. 3d 825 (D. Minn. 2025), appeal dismissed, No. 25-2981, 2026 WL 1046706 (8th Cir. Jan. 26, 2026). The Court

takes no position on the form of injunctive relief that should be sought here; instead, the Court merely notes that injunctive relief *may* be proper in this case so the Parties can swiftly brief potentially meritorious issues.

## VII. ORDER

For the preceding reasons, it is hereby

**ORDERED** that the Motion for a Temporary Restraining Order (Dkt. No. 4) is **GRANTED IN PART;**

**ORDERED** that the Temporary Restraining Order (Dkt. No. 8) is **AMENDED** as follows: The Government is enjoined from deporting the Afghan Nationals identified by Project Rousseau, Inc. and identified in Dkt. No. 16 to Pakistan, Afghanistan, or any other third country pending further order of this Court. The Government is further directed to notify the Court and Project Rousseau of any plans to deport the Afghan Nationals pending the duration of the litigation no later than one week before any such deportation;

**ORDERED** that the attorney for the Government must immediately provide a copy of this Order to Deputy Assistant Director George, to an appropriate representative of the Department of State, and to any other representative of the Department of Homeland Security who, in the judgment of the Office of the U.S. Attorney, should be notified;

**ORDERED** that the Temporary Restraining Order (Dkt. No. 8) is **EXTENDED** pending further order of this Court;

**ORDERED** that Project Rousseau is directed to amend its Complaint as described above no later than Monday, November 9, 2026 at 11:59 p.m.; and it is further

**ORDERED** that the Parties are directed to file a joint stipulated briefing schedule on a Motion for a Preliminary Injunction no later than Tuesday, November 10, 2026 at 5:00 p.m.

**SO ORDERED.**

Dated: 6 November 2026
New York, New York

Victor Marrero
U.S.D.J.