**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

PROJECT ROUSSEAU, INC.,
JOHN DOE 1-4, and
JANE DOE 1-2,

Plaintiffs,

v.

DAVID J. VENTURELLA, in his official capacity as Acting Director U.S. Immigrations and Customs Enforcement,

MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,

TODD BLANCHE, in his official capacity as Attorney General of the United States,

MARCO RUBIO, in his official capacity as Secretary of State,

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, and

U.S. DEPARTMENT OF HOMELAND SECURITY,

Defendants.

Case No. 26-cv-9602-VM

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiffs are Afghan nationals (the "Afghan Nationals") and their legal and social service provider, Project Rousseau, Inc. ("Project Rousseau"). Plaintiffs have been left to deduce that behind Defendants' stated intent to conduct a conventional removal to Afghanistan is actually a convoluted scheme to remove the Afghan Nationals to the Islamic Republic of Pakistan (hereinafter, "Pakistan"), with the hope that Pakistan will then carry out their eventual removal to Afghanistan at some unknown future date in an unknown manner. This unprecedented "coordinated" removal effort places the Plaintiff Afghan Nationals' lives and liberties in the hands of Pakistan, even though there is no stated removal plan to Pakistan. Once the Afghan Nationals are placed in Pakistan's custody, they are likely to face persecution at the hands of Pakistan or its agents, only to potentially be removed by Pakistan to their opponents in armed conflict: the Taliban, a terrorist organization exercising *de facto* control of neighboring Afghanistan. In fact, the presumed removal route would cut right through the theater of the Pakistan-Taliban war.

2. Far from a conventional removal to their country of removal, Afghanistan, this removal endangers the Afghan Nationals' lives at many junctures. They could be persecuted, tortured, or killed by the Government of Pakistan, or its agents it may enlist to take custody of them; they could be used as a political pawn in Pakistan's ongoing armed conflict with the Taliban; or they could be killed by cross-fire in the armed conflict. Once they are in the hands of their new Pakistani custodians, the Afghan Nationals will face mortal danger at every turn. There is no evidence whatsoever to suggest that Defendants have considered or taken any steps to mitigate these risks. Indeed, they have

not provided the Afghan Nationals, or their counsel, with the most basic information concerning this "coordinated" removal.

3. In this case, the Afghan Nationals do not challenge their removal orders. Instead, they challenge Defendants' reliance on Pakistan, a country that is currently engaged in a proxy war with the Taliban, to conduct a "coordinated" removal to Afghanistan.
4. The Taliban exercise *de facto* control over Afghanistan.
5. The Afghan Nationals were detained upon entry to the United States. They litigated their asylum claims – several of them *pro se* – from detention centers, but were ordered removed to Afghanistan.
6. The Afghan Nationals fled Afghanistan after the Taliban took power in Afghanistan during the U.S. withdrawal from Afghanistan in August 2021, and came to this country seeking the protection of our laws.
7. Some of the Afghan Nationals fled Afghanistan because they or their family members had supported the Western-backed Islamic Republic of Afghanistan.
8. Each of the Afghan Nationals has spent considerable time in ICE custody. For some, their detention has exceeded twenty months.

9. In October of 2026, each of the Afghan Nationals learned – either because they were "staged" for removal[1], informed by the government in pending *habeas corpus* actions[2], or informally told by ICE officers at their detention facilities – that ICE was planning to remove them in the upcoming days and/or weeks.

10. Afghanistan is controlled by the Taliban, a Specially Designated Global Terrorists (SDGT) entity designated under Executive Order 13224, with which the United States does not have diplomatic relations. *See* Exec. Order. 13268, 67 Fed. Reg. 44751 (July 2, 2002); *see also Executive Order 13224*, UNITED STATES DEP'T OF STATE, https://www.state.gov/executive-order-13224 [https://perma.cc/7PAG-5LJ5].

11. Through public reporting, Plaintiff Project Rousseau, counsel for the Afghan Nationals, learned of the Removal Plan, through which the Defendants planned to remove Afghan Nationals to Pakistan, with the expectation that Pakistan would effectuate their onward removal to Afghanistan. *See, e.g.*, Ximena Bustillo, *US Makes Plans to Deport Afghans, Families of Allies to Pakistan*, BLOOMBERG LAW (Oct. 26, 2026), https://news.bloomberglaw.com/us-law-week/us-makes-plans-to-deport-afghans-families-of-allies-to-pakistan, [https://perma.cc/BV78-A9HW].

---

[1] "Staging" is a term that refers to the process in which detainees are transferred either (i) between detention centers and/or (ii) from detention centers to airports ahead of planned removal missions. As ICE explains, "ERO uses contracted charter flights to transfer detainees throughout the United States to various ICE-managed detention facilities in preparation for removal, or to return individuals to their countries of origin. In addition, depending on geography, the number of persons being removed, and other case specifics, ERO also removes detained aliens via commercial airlines. Detainees may be escorted or unescorted on these commercial flights." Remove, Immigration & Customs Enforcement, https://www.ice.gov/remove [https://perma.cc/JA6E-5FNR].

[2] Several of the Afghan Nationals have pending actions for *habeas corpus*, in which they argue that their detention has become unconstitutionally prolonged because (i) it has exceeded the presumptively reasonable 180-day period, and (ii) their removal is not significantly likely in the reasonably foreseeable future. *Zadvydas v. Davis,* 553 U.S. 678, 701 (2001).

12. Pakistan and the Taliban are currently engaged in armed conflict. *See, e.g.*, A.K. Wazir, *et al.*, *Pakistan Warns Afghanistan of "Unbearable Punishment" as Clashes Persist Along Border*, Asia News Network (Nov. 2, 2026), https://asianews.network/pakistan-warns-kabul-of-unbearable-punishment-as-clashes-persist-along-border/ [https://perma.cc/6ZA6-9K54].

13. The Taliban have publicly warned against the Removal Plan. *See* Gavin Blackburn, *Taliban Voices 'Serious Concern' over US Plans to Deport Afghans via Pakistan*, Euronews (Nov. 2, 2026), https://www.euronews.com/2026/11/02/taliban-voices-serious-concern-over-us-plans-to-deport-afghans-via-pakistan.

14. None of the Afghan Nationals received written notice that they would be removed to Pakistan. None of the Afghan Nationals received written notice that Pakistan would take custody of them, nor play any role in, or aid in coordinating their removal to Afghanistan. Quite to the contrary, one of the Afghan Nationals was informed by an ICE Detention and Deportation Officer in a sworn declaration that the government did not have a plan to remove that individual to Pakistan, and that no such plan ever existed.

15. Defendants have not represented that Pakistan has provided diplomatic assurances that the Afghan Nationals would not be persecuted or tortured in Pakistan, nor that any such assurances– even if received– were deemed credible.

16. There is no public record that Pakistan has provided diplomatic assurances that the Afghan Nationals would not be persecuted or tortured in Pakistan, nor that the Department of State had deemed any such assurances– even if received– to be credible.

17. To the extent that such diplomatic assurances may have been given, evidence readily available to the United States government demonstrates that they are not credible.
18. Defendants have not represented that Pakistan would treat the Afghan Nationals in accordance with the 1951 Refugee Convention,[3] the Convention Against Torture, or any other international human rights norms or obligations.
19. There is no public record that Pakistan would treat the Afghan Nationals in accordance with the 1951 Refugee Convention, the Convention Against Torture, or any other international human rights norms or obligations. To the extent that such assurances or commitments exist, evidence readily available to the United States government demonstrates that they are not credible.
20. The Removal Plan violates the Afghan Nationals' constitutional due process rights and the Administrative Procedure Act. Moreover, the Removal Plan violates the *Accardi* Doctrine because it does not comport with Defendants' own guidance concerning third country removals or ICE's 2026 National Detention Standards. *See* Kristi Noem, Sec'y of Homeland Security, Guidance Regarding Third Country Removals (Mar. 30, 2025), https://immigrationlitigation.org/wp-content/uploads/2025/04/43-1-Exh-A-Guidance.pdf [https://perma.cc/5NW9-X9HQ] (the "2025 Guidance"); National Detention Standards, United States Immigration & Customs Enforcement (2026), https://www.ice.gov/doclib/detention-standards/2026/nds2026.pdf [https://perma.cc/K7LM-DT3N] (the "National Detention Standards").
21. Accordingly, the Removal Plan is illegal and cannot proceed.
22. The Removal plan also frustrates Project Rousseau's core mission to provide legal representation and social services for the Afghan Nationals. It is unclear how, and even

[3] Pakistan is not a party to the 1951 Refugee Convention.

if, Project Rousseau would be able to maintain contact with the Afghan Nationals in Pakistan.

23. If the Removal Plan is effectuated, it will place the Afghan Nationals into the hands of two warring parties. This creates additional grave risk of persecution, torture, and death.

## JURISDICTION AND VENUE

24. The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1346(a), 28 U.S.C. § 2201 and 28 U.S.C. § 2202, and 5 U.S.C. § 702.

25. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to the claims occurred, and continue to occur, in this District, and the Defendants include officers or employees of the United States acting in their official capacities. Defendants also include agencies of the United States.

## PARTIES

## PLAINTIFFS

***Project Rousseau, Inc.***

26. Plaintiff Project Rousseau is an IRS Section 501(c)(3) non-profit organization providing *pro bono* legal services, social services, and educational programming to young people and families. Its mission is to empower youth and other individuals, such as asylum-seeking immigrants, who are in the greatest need.

27. Some of Project Rousseau's clients are the Afghan Nationals.

28. Project Rousseau is a non-profit corporation based in Manhattan, New York. Its headquarters and principal place of business is located at 1560 Broadway, New York, NY 10036.

29. Project Rousseau has a *pro bono* legal services team consisting of attorneys, accredited representatives, and legal support staff. That team works out of Project Rousseau's office, located at 1560 Broadway, New York, NY 10036.

30. All legal files and documents related to the Afghan Nationals' cases are stored at Project Rousseau's office, located at 1560 Broadway, New York, NY 10036.

31. Project Rousseau also offers free-of-charge social services and educational programming, and it employs non-legal staff who provide those services and programs to clients and their families. Those staff members work out of Project Rousseau's office located at 1560 Broadway, New York, NY 10036.

32. All non-legal files and documents relating to the social services that Project Rousseau offers to the Afghan Nationals are stored at Project Rousseau's office, located at 1560 Broadway, New York, NY 10036.

***The Afghan Nationals***[4]

33. **Plaintiff Jane Doe 1** is a ~27 year-old Afghan Christian woman who fled Afghanistan because of a well-founded fear of persecution based on her Hazara ethnicity, her Christian faith, and her political opinion. She is a baptized Christian who does not wear the hijab and has numerous permanent tattoos, which are forbidden under Islamic law. She worked as a journalist at the Hamsada Radio Network from January 2019 to August 2021. At Hamsada Radio Network, she covered a variety of topics, including local news in Kabul and Takhar provinces, politics, peace and security, and women and girls.[5] She has been held in ICE custody since she entered the United States in April 2025. Her I-589 Application for Asylum, Withholding of Removal, and Protection under the

---

[4] The Afghan Nationals are seeking leave of Court to proceed pseudonymously, as John Doe and Jane Doe plaintiffs, in order to protect their privacy and safety.

[5] Jane Doe 1 worked as a journalist at the Hamsada Radio Network from January 2019 to August 2021. At Hamsada Radio Network, she covered a variety of topics, including local news in Kabul and Takhar provinces, politics, peace and security, and women and girls. In 2019, two other journalists from the Hamsada Radio Network were murdered by the Taliban. *See Two Radio Journalists Shot and Killed in Northern Afghanistan*, COMMITTEE TO PROTECT JOURNALISTS (Feb. 6, 2019), https://cpj.org/2019/02/two-radio-journalists-shot-and-killed-in-northern/.

Convention Against Torture was pretermitted on December 5, 2025, and she was ordered removed on that date. That order has been administratively final since January 5, 2026. She is currently detained in Louisiana. She has an action for *habeas corpus*, which has been pending since July 28, 2026. On August 28, 2026, she learned, through her *habeas corpus* action, that she had been accepted by the Central African Republic. But she has not been removed to the Central African Republic. Then, on October 29, 2026, she learned, through her *habeas corpus* action, that she had been "tentatively scheduled . . . for removal from the United States to Afghanistan within the next five days" – *i.e.*, by November 3, 2026. *See* Exhibit A, Jane Doe 1 October 29, 2026 Advisory (Redacted). On November 2, 2026, Jane Doe 1 filed a motion to reopen her immigration proceedings with the Immigration Court, as well as a motion for an emergency stay of her removal order. On November 3, 2026, the Magistrate Judge in her *habeas corpus* action recommended that the Court grant the Petition and order her release. Plaintiff Jane Doe 1 has not been removed from the United States or released from custody to date.

34. **Plaintiff John Doe 1** is a Hazara Shia Muslim and citizen of Afghanistan. Taliban members beat John Doe 1 with rifle butts and pipes as he prepared to observe Arba'in, a Shia religious holiday. Following the Taliban's takeover in 2021, John Doe 1 fled Afghanistan in fear for his life because of his Hazara ethnicity, Shia faith, and ties to the former Western-backed Afghan government. Before the Taliban takeover, John Doe 1 worked as an engineer for companies holding government contracts. He entered the United States in January 2025, and he has been detained since he entered. He subsequently filed a timely I-589 Application for Asylum, Withholding of Removal, and Protection under the Convention Against Torture. His applications for relief were denied

on July 18, 2025, and his appeal to the BIA was dismissed on January 14, 2026. He is currently detained in Texas. He filed an action for *habeas corpus* on July 17, 2026, which is pending. On or around October 22, 2026, Plaintiff John Doe 1 was informed by an ICE officer that he would be removed from the United States during the first or second week of November 2026. On or around October 30, 2026, in the early morning hours, John Doe 1 and about nine other Afghans were taken from their detention center in Texas, brought to a location that was ostensibly an airport, and returned to detention in Texas that same day. It appears that Plaintiff John Doe 1 was being "staged" for removal, but he was not informed of his intended destination or the reason that the removal mission was not executed. Plaintiff John Doe 1 has not been removed from the United States or released from custody to date.

35. **Plaintiff John Doe 2** is a Hazara Shia Muslim and citizen of Afghanistan who has had two brothers killed by the Taliban. Following the Taliban's takeover in 2021, John Doe 2 fled in fear for his life because of his Hazara ethnicity, Shia faith, and his family's ties to the former Western-backed Afghan government and allied international forces. One of his brothers had worked for a construction company holding contracts with the former Afghan government and allied forces. In the weeks leading up to his flight from Afghanistan, Taliban members raided John Doe 2's home and beat him twice. He entered the United States in July 2024, and he has been detained since his entry. He subsequently filed a timely I-589 Application for Asylum, Withholding of Removal, and Protection under the Convention Against Torture. His applications for relief were denied on February 3, 2025, and he was ordered removed on that date. He filed an action for *habeas corpus* on April 7, 2026, and that case is pending. Plaintiff is currently detained

in Texas. Plaintiff was among the group of ~10 Afghans who were taken on or around October 30, 2026 from their detention center in Texas, brought to a location that was ostensibly an airport, and returned to detention in Texas that same day for apparent removal "staging." On November 3, 2026, John Doe 2 filed a motion to reopen his immigration proceedings with the Immigration Court, as well as a motion for an emergency stay of his removal order. Plaintiff John Doe 2 has not been removed from the United States or released from custody to date.

36. **Plaintiff John Doe 3** is a male citizen and national of Afghanistan. Following the Taliban's takeover in 2021, John Doe 3 fled Afghanistan in fear for his life because of his Hazara ethnicity, Shia faith, and multiple visible tattoos. Taliban members had previously harmed John Doe 3 with a knife, attempting to carve the tattoos from his skin. He entered the United States in December 2024 and was detained upon entry. He filed a timely I-589 Application for Asylum, Withholding of Removal, and Protection under the Convention Against Torture. He was ordered removed on June 17, 2025, and his appeal to the BIA was dismissed on January 9, 2026. He brought an action for *habeas corpus*, and the Court ordered his release from custody on August 28, 2026, on the ground that his detention had become unconstitutionally prolonged. He was re-detained on October 27, 2026 at an ICE check-in in California. At that check-in, he was provided with a document stating that he would be removed to Afghanistan on or before November 25, 2026. His counsel subsequently filed a motion to enforce the District Court's judgment ordering his release, and that motion is pending. He is currently detained in Louisiana. Plaintiff John Doe 3 has not been removed from the United States to date.

37. **Plaintiff Jane Doe 2** is a female citizen and national of Afghanistan. She fled Afghanistan following the Taliban takeover, fearing for her life due to her Hazara ethnicity and her Christian faith. Jane Doe 2's brother was imprisoned and tortured by the Taliban because he is a Christian convert. She entered the United States in August 2025, and she has been detained since her entry. Her I-589 Application for Asylum, Withholding of Removal, and Protection under the Convention Against Torture was denied on November 6, 2025, and she was ordered removed on that date. She filed a Motion to Reopen on December 3, 2025, and it was denied. An appeal of the denial was filed with the BIA on January 2, 2026, and remains pending. An emergency motion for a stay of removal was filed with the BIA on November 3, 2026. Plaintiff Jane Doe 2 was among the group of Afghans who, alongside John Doe 1 and John Doe 2, were taken on or around October 30, 2026 from their detention center in Texas, brought to a location that was ostensibly an airport, and returned to detention in Texas that same day for apparent removal "staging." She is currently detained in Texas. Plaintiff Jane Doe 2 has not been removed from the United States or released from custody to date.

38. **Plaintiff John Doe 4** is a male citizen and national of Afghanistan. He fled Afghanistan following the Taliban takeover, fearing for his life because he had worked as a telecommunications assistant at a company that had contracted with the United States Department of Defense in Afghanistan. He entered the United States in November 2025, and he was detained upon entry. He received a negative "credible fear" determination. That finding was affirmed by an Immigration Judge, and he was ordered removed on December 19, 2024. Plaintiff John Doe 4 filed an action for *habeas corpus*, and the District Judge ordered his release pursuant to *Zadvydas*, 553 U.S. 678, on July 15, 2026.

Plaintiff was re-detained on October 15, 2026 at an ICE check-in in Virginia and served with a document stating that his removal was scheduled to take place "no later than" November 3, 2026. Upon his re-detention, Petitioner was transferred to a detention center in Louisiana, where he remains in custody. On November 6, 2026, he filed a motion to enforce the District Court's judgment ordering his release, and that motion is pending. Plaintiff John Doe 4 has not been removed from the United States to date.

## DEFENDANTS

39. David J. Venturella is the Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement. He is sued in his official capacity.

40. Markwayne Mullin is the Secretary of the Department of Homeland Security. He is sued in his official capacity.

41. Todd Blanche is the Attorney General of the United States. He is sued in his official capacity.

42. Marco Rubio is the Secretary of State. As Secretary of State, he is the President's chief foreign affairs adviser. He carries out the President's foreign policies through the State Department and the Foreign Service of the United States. He is sued in his official capacity.

43. The Department of Homeland Security ("DHS") is the federal agency responsible for administering and enforcing the immigration laws.

44. United States Immigration and Customs Enforcement ("ICE") is an operational agency within DHS. ICE consists of four operational directorates: Homeland Security Investigations ("HSI"), Enforcement and Removal Operations ("ERO"), Office of the Principal Legal Advisor ("OPLA"), and Management and Administration ("M&A").

## FACTS

### I. The Afghan Nationals Learn That The Government Intends to Effectuate Their Removal Orders

45. The Afghan Nationals are all citizens and nationals of Afghanistan.

46. The Afghan Nationals are all subject to final removal orders to Afghanistan.

47. The Afghan Nationals are all detained in ICE custody.

48. On October 15, 2026, Plaintiff John Doe 4 – who had been ordered released from ICE custody in a *habeas corpus* action in July of 2026 – was re-detained at an ICE check-in in Virginia. At that check-in, he was served with a document stating that his removal was scheduled to take place "no later than" November 3, 2026.

49. On October 27, 2026, Plaintiff John Doe 3 – who had been ordered released from ICE custody in a *habeas corpus* action in August of 2026 – was re-detained at an ICE check-in in California. At that check-in, he was provided with a document stating that he would be removed to Afghanistan on or before November 25, 2026.

50. On October 29, 2026, in Plaintiff Jane Doe 1's federal *habeas corpus* action, the federal respondents submitted an "Advisory" to the Court stating that Plaintiff had been "tentatively scheduled . . . for removal from the United States to Afghanistan within the next five days" – *i.e.*, by November 3, 2026. *See* Exhibit A, Jane Doe 1 October 29, 2026 Advisory (Redacted).[6]

51. On October 30, 2026, Plaintiffs John Doe 1, John Doe 2, and Jane Doe 2 – who were detained in the same Texas facility – along with several other Afghans from their facility,

[6] At the time that the federal respondents submitted this "Advisory," a Preliminary Injunction in Jane Doe 1's case was in effect, which, *inter alia*, required the federal respondents to comply with the March 2025 Guidance as to Plaintiff, and further required the federal respondents to afford her seven days' notice of any third country to which she would be removed. Pakistan is not mentioned in the Advisory. The District Court dissolved the Preliminary Injunction on October 30, 2026.

were taken from their detention center in Texas, brought to a location that was ostensibly an airport, and returned to detention that same day. It appears that Plaintiffs were being "staged" for removal, but they were not informed of their intended destination or the reason that the removal mission was not executed.

## II. Reporting Reveals the Removal Plan

52. In late October of 2026, major news outlets began to report on the Removal Plan: *i.e.*, that Defendants planned to remove Afghan nationals to Pakistan, with the expectation that Pakistan would effectuate their onward removal to Afghanistan. *See, e.g.*, Ximena Bustillo, *supra*; Pranav Baskar, *et al.*, *U.S. to Send Dozens Back to Afghanistan, Despite Risk of Persecution*, N.Y. TIMES (Oct. 30, 2026), https://www.nytimes.com/2026/10/30/world/asia/afghan-refugees-deported-flight-pakistan.html.

53. Pakistan and the Taliban are currently engaged in a volatile proxy war. *See* Elian Peltier, *'Open War' Between Afghanistan and Pakistan Adds a Volatile Element*, N.Y. TIMES (Oct. 22, 2026), https://www.nytimes.com/2026/10/22/world/asia/afghanistan-pakistan-proxy-war.html. In particular, there have been recent reports of clashes along the border between Pakistan and the Taliban-controlled Afghanistan. *See id.*; *see also* A.K. Wazir, *et al.*, *supra*.

54. The U.S. Department of State has a Level 3 Travel Advisory in place for Pakistan, advising people to reconsider travel to Pakistan "due to armed conflict, terrorism, crime, and kidnapping." *Pakistan Travel Advisory*, U.S. DEP'T OF STATE (June 16, 2026), https://travel.state.gov/en/international-travel/travel-advisories/pakistan.html?gad_source=1&gad_campaignid=44031958015&gbraid=0AAAAAqbBk5tUfx_6uSRwgHrJjr3T2W

R4U&gclid=CjwKCAiAtbvXBhB_EiwAjwv9JiFlD4RI8OTsq06hRXx2qkNyWR8GjIiSbAafXhsH-iLDnglYuoTAdBoCWxIQAvD_BwE.

55. The U.S. Department of State has described, in its 2024 Human Rights Report for Pakistan, "[s]ignificant human rights issues[,]" including, *inter alia*, "unlawful or arbitrary killings; disappearances; torture or cruel, inhuman, or degrading treatment or punishment[.]" *Pakistan 2024 Human Rights Report*, U.S. DEP'T OF STATE (2024), https://www.state.gov/wp-content/uploads/2025/07/624521_PAKISTAN-2024-HUMAN-RIGHTS-REPORT.pdf.

56. The Taliban have publicly warned against the Removal Plan. *See* Gavin Blackburn, *Taliban Voices 'Serious Concern' over U.S. Plans to Deport Afghans via Pakistan*, *supra*.

57. Pakistan recently sentenced a Christian to death for defaming the Prophet. *See* Beth Bailey, *Pakistan's Top Court Upholds Christian Man's Death Sentence for Blasphemy*, FOX NEWS (Oct. 27, 2026), https://www.foxnews.com/world/pakistans-top-court-upholds-christian-mans-death-sentence-blasphemy.

58. Afghan migrants in Pakistan have recently been forcibly returned to Afghanistan by the Pakistani government, pursuant to a directive issued by Pakistan's Ministry of Interior on June 28, 2026 that instructed the detention and deportation of Afghan nationals in Pakistan without valid documentation. *See Pakistan: Afghan migrants face harassment, torture, detention*, GENOCIDE WATCH (Nov. 3, 2026), https://www.genocidewatch.com/single-post/pakistan-afghan-migrants-face-harassment-torture-detention [https://perma.cc/SR57-62XX]. Additionally, Afghan nationals in

Pakistan have reported harassment, torture, and mistreatment by the Pakistani police. *See id.*

## III. The "Removal Plan" Is Confirmed, Although the Government's Information is Inconsistent

59. The Afghan Nationals have not been removed from the United States.

60. The Afghan Nationals remain in ICE custody.

61. On October 30, 2026, in litigation pending in another District Court, involving an Afghan national who is not a party to this lawsuit, the Government informed the Court that the November 3, 2026 flight "would not be a direct, non-stop flight to Afghanistan, and that the plane's final destination would be Pakistan with further transport onward to Afghanistan." *See* Exhibit B, Declaration of SDDO Sergio Aguilar, ¶ 9 (Redacted).

62. On November 3, 2026, at a hearing before The Honorable Judge Valerie E. Caproni in this matter, Defendants' counsel relayed that Mr. Christopher George, ICE Deputy Assistant Director for Enforcement and Removal Operations, had represented to counsel that ICE had no planned or confirmed chartered or commercial flights for the purposes of deporting Afghan nationals present in the United States to Afghanistan or to Pakistan, at least through the end of the week. *See* Dkt No. 8, Order, at 1.

63. At the same hearing, Mr. Christopher George also represented, through counsel, "that it takes weeks to make such arrangements"— *i.e.*, for the removal of Afghan nationals. *Id.* at 2.

64. Judge Caproni entered a Temporary Restraining Order "requiring Defendants to comply with and adhere to" these representations. *See id.* at 2.

65. Also on November 3, 2026, at a hearing before The Honorable Judge Dabney L. Friedrich in the United States District Court for the District of Columbia, counsel for the

federal government described the government's plans to remove one of the Afghan Nationals to Afghanistan as a "coordinated removal." *See* Exhibit C, *M.B. v. Venturella, et al.*, Case No. 36-cv-03866-DLF, Hr'g Tr. 15:16-17, 16:9-10 (D.D.C. Nov. 3, 2026). When Judge Friedrich asked counsel if the plaintiff would be removed to Afghanistan "directly[,]" counsel stated: "So it's not going to -- it's a coordinated removal. That's about all I can say." *Id.*, Nov. 3 Hr'g Tr. 16:9-10.

66. Curiously, on November 4, 2026, one of the Afghan Nationals was informed by an ICE Detention and Deportation Officer in a sworn declaration that the government did not have a plan to remove that individual to Pakistan, and that no such plan ever existed.

67. On November 6, 2026, at another hearing before Judge Friedrich in *M.B. v. Venturella, et al.*, counsel for the federal government represented that the Removal Plan is a first-country removal. *See* Exhibit D, *M.B. v. Venturella, et al.*, Case No. 36-cv-03866-DLF, Hr'g Tr. 7:2-8 (D.D.C. Nov. 6, 2026).

68. However, at the same hearing on November 6, 2026, counsel for the federal government also represented that the Afghan National's removal would be to Pakistan, not to Afghanistan. *See* Exhibit E, *M.B. v. Venturella, et al.*, Case No. 36-cv-03866-DLF, Hr'g Tr. 36:11-24 (D.D.C. Nov. 6, 2026) (The Court: "But they're admitting here she's going to Pakistan.").

69. At the same hearing on November 6, 2026, government counsel stated that "there's no current plan right now and no flight in place." *See* Exhibit D, *M.B. v. Venturella, et al.*, Case No. 36-cv-03866-DLF, Hr'g Tr. 7:14-17 (D.D.C. Nov. 6, 2026). Government counsel further stated that "no removal is planned at least until at least Sunday [November 8, 2026] for now." *See id.*, 7:2-8.

70. Despite the government's representations in this case on November 3, 2026 that ICE had no planned or confirmed chartered or commercial flights for the purposes of deporting Afghan nationals present in the United States to Afghanistan or to Pakistan, at least through November 7, 2026, *see* Dkt No. 8, on November 9, 2026, in a case involving one of the Afghan Nationals, an ICE Supervisory and Deportation Officer affirmed that that individual had been "manifested for a Special High-Risk Charter (SHRC) flight to Afghanistan" that had been "scheduled for November 3, 2026[]" but "ultimately postponed." *See* Exhibit F ¶ 4, Declaration of SDDO Campbell (Redacted).

## IV. Plaintiffs Are Left in the Dark as to the "Removal Plan," and Have Had No Opportunity to Challenge It

71. To date, the Afghan Nationals have not been informed that they will be removed to Pakistan.

72. To date, the Afghan Nationals have not received written notice that they will be removed to Pakistan, despite the Government's admission that the "final destination would be Pakistan with further transport onward to Afghanistan." Exhibit B, Declaration of SDDO Sergio Aguilar, ¶ 9 (Redacted); *see also* Exhibit E, *M.B. v. Venturella, et al.*, Case No. 36-cv-03866-DLF, Hr'g Tr. 36:22-24 (D.D.C. Nov. 6, 2026) (The Court: "But you're not contesting the notion that she will first be in Pakistan for some limited period of time?" Government Counsel: "No.").

73. To date, the Afghan Nationals have not received notice that Pakistan, government officials of Pakistan, or private contractors hired by the Pakistan government will coordinate their onward transport to Afghanistan.

74. The government has not represented that it has obtained any assurances that individuals removed to Pakistan, or removed to the country of origin via the United States

Governments' "coordination" with Pakistan, would not be subject to torture or persecution in Pakistan.

75. The Afghan Nationals were not put on notice that they may be removed to Pakistan, or removed to their country of origin via the United States Government's "coordination" with Pakistan, during their removal proceedings.

76. The Afghan Nationals have not appeared before an immigration officer, U.S. Citizenship and Immigration Services ("USCIS"), or an Immigration Judge for a screening for eligibility for protection under INA § 241(b)(3) and the Convention Against Torture ("CAT") with respect to their fear of being removed to Pakistan.

77. The Afghan Nationals have not received individualized hearings with respect to their fear of being removed to Pakistan.

78. Pakistan is not a party to the 1951 Refugee Convention.

79. DHS's own March 30, 2025 Guidance Regarding Third Counrty Removals, reaffirmed in July 2025, requires that, before removing someone to a third country, Defendants must either (i) obtain "diplomatic assurances that aliens removed from the United States will not be persecuted or tortured" in that country, or (ii) provide Plaintiff with written notice of the country to which she will be removed in a language she understands, or the opportunity to express a fear of persecution or torture in that country. Kristi Noem, Sec'y of Homeland Security, Guidance Regarding Third Country Removals, *supra*.[7]

---

[7] The procedures due to noncitizens facing third-country removal are being litigated in *D.V.D. v. U.S. Dep't of Homeland Sec.*, 821 F. Supp. 3d 102 (D. Mass. 2026), *aff'd in part, vacated in part,* No. 26-1212, 2026 WL 2797801 (1st Cir. Sept. 18, 2026), and *cert. granted sub nom. Dep't of Homeland Sec. v. D.V.D.*, No. 26-426, 2026 WL 2917860 (U.S. Sept. 29, 2026).
That litigation does not excuse the government from the basic procedures set forth in its own March 2025 Guidance. Indeed, "on July 9, 2025, DHS reaffirmed by memorandum its intention to follow the March 30, 2025, policy document. *D.V.D.*, 2026 WL 2797801, at *83, *cert. granted sub nom.* No. 26-426, 2026 WL 2917860 (citing Memorandum from Todd M. Lyons, Acting Director, ICE, to All ICE Employees, Third Country Removals Following the Supreme

80. The countries to which noncitizens may be removed are described in 8 U.S.C. § 1231(b)(1) and § 1231(b)(2). In certain circumstances, the Attorney General is authorized to conduct a third-country removal, but only where it is "impracticable, inadvisable, or impossible to remove the alien to each country described" in earlier subprovisions. 8 U.S.C. § 1231(b)(2)(E)(vii). In such cases, the noncitizen shall be removed to "another country whose government will accept the alien into that country." *Id.*

81. Third-country removals are subject to 8 U.S.C. § 1231(b)(3). *See* 8 U.S.C. § 1231(b)(2). Under 8 U.S.C. § 1231(b)(3)(A), "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. § 208.16.

82. Third-country removals are also subject to the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231), codifying protections under the Convention Against Torture ("CAT"). Under FARRA, an individual may not be removed "to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." 8 U.S.C. § 1231 Note ("United States Policy With Respect to Involuntary Return of Persons in Danger of Subjection to Torture"); 8 C.F.R. §§ 208.16–18, 1208.16–18; 28 C.F.R. § 200.1.

---

Court's Order in *Department of Homeland Security v. D.V.D.*, No. 24A1153 (U.S. June 23, 2025)).

## V. Organizational Harm to Plaintiff Project Rousseau

83. When representing detained clients, Project Rousseau diligently seeks out consistent communication with each client and publicly available information about any possible third-country removals.

84. When a client is due to be removed, Project Rousseau will speak with the client to ensure that they have planned, to whatever degree possible, to minimize risk to their safety in the country to which they are being removed.

85. When a client is due to be removed, Project Rousseau will also assist in helping that individual coordinate with friends, family, and humanitarian aid workers in the country to which they are due to be removed to minimize risk to their safety and help facilitate their arrival.

86. Project Rousseau continues to assist clients *pro bono* after they are removed. For instance, Project Rousseau might help the client recover documents retained by ICE.

87. Additionally, if the client still has proceedings pending in the United States after they are removed (either before an immigration court, the BIA, or a federal court), Project Rousseau continues to litigate their claims *pro bono*.

88. The Removal Plan significantly impairs Project Rousseau's ability to assist the Afghan Nationals in preparing for their arrival in the country to which they are removed, including coordination with friends, family, other non-profit organizations, and humanitarian aid workers.

89. The Removal Plan significantly impairs Project Rousseau's ability to adequately represent the Afghan Nationals. The Removal Plan only came to light days before the

first Afghan National was scheduled for such removal. To date, the Afghan Nationals still have not received confirmation as to Pakistan's role in their removal.

90. The lack of information given to the Afghan Nationals, or their counsel, concerning the Removal Plan has made it difficult to challenge those removals.

91. If the Afghan Nationals are removed pursuant to the Removal Plan, Project Rousseau would very likely lose contact with those clients, making it very difficult if not impossible to litigate their matters that remain pending in United States courts.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of Due Process – The *Accardi* Doctrine

92. Plaintiffs repeat and reallege each allegation of this complaint here.

93. The *Accardi* doctrine holds that "government agencies are required to follow their own 'existing valid regulations.'" *Catholic Leg. Immigr. Network, Inc. v. Rubio*, 840 F. Supp. 3d 209, 246 (S.D.N.Y. 2026) (quoting *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)).

94. The ambit of the *Accardi* doctrine "is not limited to rules attaining the status of formal regulations." *Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991).

95. Because the Removal Plan purports to remove the Afghan Nationals to Pakistan (without disclosing any plans or details for their onward transport to Afghanistan), this constitutes a third-country removal.

96. The Removal Plan violates regulations, statutes, agency guidance, and agency standards that were formulated to protect individuals such as the Afghan Nationals.

97. The Removal Plan violates the Afghan Nationals' interest in their health, safety, life, liberty, and right to be notified of their country of removal.

98. The Removal Plan violates regulations, statutes, agency guidance, and agency standards that were formulated to protect the attorney-client relationship.

99. The Removal Plan violates Project Rousseau's interest in serving its clients, protecting their safety, and advocating for their rights.

100. The Removal Plan does not comport with DHS's March 2025 Guidance Regarding Third Country Removals. *See* Kristi Noem, Sec'y of Homeland Security, Guidance Regarding Third Country Removals, *supra*. The government has not represented that it has received assurances from Pakistan that the Afghan Nationals would not be persecuted or tortured in Pakistan or that such assurances were credible. Nor has it afforded the Afghan Nationals notice or an opportunity to be heard on their fear of being removed to Pakistan.

101. The Removal Plan does not comport with ICE's 2026 National Detention Standards. *See, e.g.*, National Detention Standards, United States Immigration & Customs Enforcement, *supra*, Standard 2.9.II.R. (Legal Visits); Standard 2.9II.W. Telephone Access; Standard 5.5.II.G. (Visits by Legal Representatives and Legal Assistants); Standard 5.4 (Telephone Access); Standard 7.2 (Detainee Transfers).

102. By failing to follow DHS's March 2025 Guidance and ICE's 2026 National Detention Standards, Defendants are violating due process under the *Accardi* Doctrine.

103. Because the Removal Plan does not comport with applicable statutes and regulations concerning the removal process, Defendants are violating due process under the Accardi Doctrine.

**SECOND CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 704, 706**

104. Plaintiffs repeat and reallege each allegation of this complaint here.

105. The Removal Plan constitutes final agency action within the meaning of 5 U.S.C. § 704.

106. Upon information and belief, Defendants have formulated the Removal Plan, and they have instructed ICE and DHS officers and agents to implement the Removal Plan. This constitutes a final agency action within the meaning of the APA because it marks the consummation of the agency's decision-making process, and it is one by which rights or obligations have been determined, or from which legal consequences will flow, *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

107. Under the APA, 5 U.S.C. § 702, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

108. The APA prohibits an administrative agency from taking any action that– among other actions– are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[,]" "without observance of procedure required by law[,]" or "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2).

109. The Removal Plan violates the APA because it violates DHS's own guidance concerning third-country removals. *See* Kristi Noem, Sec'y of Homeland Security, Guidance Regarding Third Country Removals, *supra*.

110. The Removal Plan violates the APA because it does not comport with ICE's 2026 National Detention Standards. *See* National Detention Standards, United States Immigration & Customs Enforcement, *supra*.

111. The Removal Plan violates the APA because it does not comport with 8 U.S.C. § 1231(b)(2)(E)(vii). The government has not shown that is "impracticable, inadvisable, or impossible to remove the alien to each country described" in 8 U.S.C. § 1231(b)(2)(i-iv), and that Pakistan's "government will accept the alien into that country." 8 U.S.C. § 1231(b)(2)(E)(vii); *see also* 8 C.F.R. § 241.15.

112. The Removal Plan violates the APA because it does not comport with 8 U.S.C. § 1231(b)(3) and implementing regulations. It is more likely than not that the Afghan Nationals' "life or freedom would be threatened in [Pakistan] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16–18, 1208.16–18.

113. The Removal Plan violates the APA because it does not comport with FARRA and implementing regulations. "[T]here are substantial grounds for believing the [Afghan Nationals] would be in danger of being subjected to torture" in Pakistan. 8 U.S.C. § 1231 Note ("United States Policy With Respect to Involuntary Return of Persons in Danger of Subjection to Torture"); *see also* 8 C.F.R. §§ 208.16–18, 1208.16–18; 28 C.F.R. § 200.1.

114. The Removal Plan violates the APA because it does not comport with provisions of the Immigration and Nationality Act and implementing regulations that protect the Afghan Nationals' privilege of being represented (at no expense to the Government) in their immigration proceedings. *See* 8 U.S.C. § 1229a(b)(4)(A); 8 U.S.C. § 1362; 8 C.F.R. § 1003.16.

115. The Removal Plan violates the APA because it does not comport with 28 U.S.C. § 1654, which protects the right of the parties to "plead and conduct their own cases personally or by counsel," in all courts of the United States. 28 U.S.C. § 1654.

116. The Afghan Nationals' interests in their health, liberty, lives, and physical safety are within the "zone of interests," *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 131 (2d Cir. 2020), protected by the INA, FARRA, and implementing regulations.

117. The Afghan Nationals' interests in their ability to litigate their claims in United States courts with the assistance of counsel are within the "zone of interests," *Moya*, 975 F.3d at 131, protected by the INA, FARRA, and implementing regulations.

118. Project Rousseau's interest in its ability to communicate with its clients is within the "zone of interests" protected by 28 U.S.C. § 1654, 8 U.S.C. § 1229a(b)(4)(A), 8 U.S.C. § 1362, and implementing regulations.

119. Defendants' violations of the APA will cause harm to the Afghan Nationals because it will cause them to be removed to Pakistan in a manner that is substantially unsafe, placing their health, liberty, lives, and physical safety at risk.

120. Defendants' violations of the APA will cause harm to the Afghan Nationals because it will impair their ability to litigate their ongoing legal claims and correspond with Project Rousseau.

121. Defendants' violations of the APA will cause harm to Project Rousseau because it will impair the organization's ability to litigate the Afghan Nationals' claims, communicate with them, be properly notified of their location and custodian, and support the Afghan Nationals' (and their friends and families) in planning for their removal.

122. Plaintiffs' injuries are directly traceable to the Removal Plan.

123. There is a substantial likelihood that the requested relief will redress these injuries.

124. There are no other adequate remedies available in a court to redress Plaintiffs' injuries. To the extent that such remedies exist, they would provide only doubtful and limited relief.

**THIRD CLAIM FOR RELIEF**
**Violation of the Due Process of the Fifth Amendment**
***Afghan Nationals Against All Defendants***

125. Plaintiffs repeat and reallege each allegation of this complaint here.

126. The Due Process Clause of the Fifth Amendment provides in relevant part that "[n]o person shall be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V.

127. The Due Process Clause protects the Afghan Nationals' constitutionally protected liberty interests in their lives, safety, and physical liberty. *See Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) (stating that the "interest in being free from imprisonment" is "the most significant liberty interest there is.").

128. The Due Process Clause protects the Afghan Nationals' ability to defend themselves and confer with counsel in their legal proceedings.

129. The Due Process Clause extends to all people, regardless of their citizenship status.

130. "The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914). *See also Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'").

131. The Afghan Nationals did not receive any notice that they would be removed in a "coordinated" removal.

132. The Afghan Nationals have also not been provided with a definition of "coordinated" removal, what it entails, by whom they will be held in Pakistan, or even that they are actually going to Pakistan at all.

133. The Afghan Nationals did not receive any notice that Pakistan, government officials of Pakistan, or private contractors hired by the Pakistan government will coordinate their onward transport to Afghanistan.

134. The Afghan Nationals did not receive any information concerning how they would be transported between Pakistan and the Taliban, nor when or by whom.

135. The Afghan Nationals did not receive information concerning whether they would be liberated in Pakistan or whether they would remain in Pakistani custody and confinement, or even under the custody and confinement of a private contractor sub-contracted by the Government of Pakistan.

136. The Afghan Nationals have not had an opportunity to challenge their "coordinated" removal to Pakistan.

137. The Afghan Nationals have not had an opportunity to be heard on their concerns about the dangers involved in their "coordinated" removal.

138. The Afghan Nationals have not had an opportunity to be heard on their concerns for their life and safety if they are sent to Pakistan, which is not engaged in a proxy war with the Taliban.

## FOURTH CLAIM FOR RELIEF
## Violation of Due Process under the Fifth Amendment – Reckless Endangerment; New York Penal Law § 120.20
***Afghan Nationals Against ICE, DHS, Markwayne Mullin, and David J. Venturella***

139. Plaintiffs repeat and reallage each allegation of this petition here.

140. The Afghan Nationals' health, freedom, and physical safety are protected liberty interests.

141. Defendants have an affirmative duty to protect the Afghan nationals because they are in Defendants' custody and control.

142. Defendants' formulation of the Removal Plan was reckless because they disregarded a "substantial and unjustifiable risk" to the Afghan Nationals' health, freedom, and physical safety, and the risk is "of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." N.Y. Penal Law § 15.05(3).

143. The Removal Plan creates a substantial risk of serious physical injury to the Afghan Nationals. Namely, it purports to remove them to Pakistan, which is in active conflict with the Taliban.

144. The Removal Plan's disregard for the Afghan Nationals' health, freedom, and physical safety is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Estate of Phillips v. District of Columbia,* 455 F.3d 397, 403 (D.C. Cir. 2006) (citation omitted).

**FIFTH CLAIM FOR RELIEF**
**Violation of the Immigration and Nationality Act ("INA"), Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), and Implementing Regulations**
***Afghan Nationals Against All Defendants***

145. Plaintiffs repeat and reallage each allegation of this petition here.

146. The Removal Plan violates FARRA, which provides that it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically

present in the United States." 8 U.S.C. § 1231 note ("United States Policy With Respect to Involuntary Return of Persons in Danger of Subjection to Torture"); 8 C.F.R. § 208.16(c); 28 C.F.R. § 200.1.

147. There are substantial grounds for believing that the Afghan Nationals would be subjected to torture in Pakistan on account of their race, religion, nationality, political opinion, and membership in particular social groups.

148. The Removal Plan violates 8 U.S.C. § 1231(b)(3)(A) because it is more likely than not that the Afghan Nationals' "life or freedom would be threatened" in Pakistan "because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. § 208.16.

149. The Afghan Nationals' lives and freedom are also distinctly threatened by the specific plan to remove them to Pakistan and then Afghanistan by Pakistan, independently of the threats they face in either country. The ongoing armed conflict between Pakistan and the Taliban creates distinct risks to life and freedom, which must be evaluated in addition to the separate risks to life and freedom in each country independently.

150. By removing the Afghan Nationals to Pakistan, where their life and freedom are threatened because of their race, religion, nationality, and membership in particular social groups, Defendants would violate the INA, FARRA, and implementing regulations.

151. By effectuating a further removal by transferring or arranging for the transfer of the Afghan Nationals between Pakistan and the Taliban, who are engaged in active armed conflict with one another along the very border across which Defendants hope the Afghan Nationals are removed, Defendants would violate the INA, FARRA, and implementing regulations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Assume jurisdiction over this case;
2. Declare that the Removal Plan violates the Fifth Amendment of the United States Constitution;
3. Declare that the Removal Plan violates the *Accardi* Doctrine;
4. Declare that the Removal Plan violates INA and FARRA;
5. Declare that deportation of the Afghan Nationals without proof of the receipt of diplomatic assurances from Pakistan that the Afghan Nationals would not be persecuted or tortured there, and a finding that such assurances are credible, violates the *Accardi* Doctrine;
6. Declare that deportation of the Afghan Nationals to a country adjacent to their country of origin, that is engaged in active combat with the group exercising *de facto* control over their country of origin, is unlawful and amounts to reckless endangerment;
7. Declare that the Removal Plan violates the APA because it is arbitrary and capricious, an abuse of discretion, and not in accordance with the law;
8. Enjoin the removal of the Afghan Nationals to Pakistan absent further order of this Court;
9. Enjoin the effectuation of the Removal Plan; and
10. Grant any further relief this Court deems just and proper.

Dated: November 9, 2026

Respectfully submitted,

*/s/ Andrew Heinrich*
Andrew Heinrich
*Supervising Attorney*
Project Rousseau, Inc.
1560 Broadway, Suite 805
New York, NY 10036
Email: Andrew.Heinrich@projectrousseau.org
Phone: +1 (917) 734-7219

*/s/ Olivia Natale*
Olivia Natale
*Staff Attorney*
Project Rousseau, Inc.
1560 Broadway, Suite 805
New York, NY 10036
Email: Olivia.Natale@projectrousseau.org
Phone: +1 (860) 966-5805