**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PROJECT ROUSSEAU, INC.,<br>JOHN DOE 1-4, and JANE DOE 1-2,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID J. VENTURELLA, MARKWAYNE MULLIN, TODD BLANCHE, MARCO RUBIO, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | Case No. 26-cv-9602-VM |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Dated: November 17, 2026

# TABLE OF CONTENTS

*I. INTRODUCTION* ........ *1*

A. Plaintiffs Learn of the "Removal Plan" ........ 1

B. This Action ........ 3

*II. LEGAL STANDARD* ........ *3*

*III. THRESHOLD ISSUES* ........ *4*

A. This Court Has Jurisdiction to Enter a Preliminary Injunction ........ 4

B. The Plaintiffs Have Standing ........ 4

1. The Afghan Nationals Have Standing ........ 4
2. Project Rousseau Has Organizational Standing ........ 6

C. Zone of Interests ........ 11

D. Venue is Proper in this District ........ 14

*IV. ARGUMENT* ........ *15*

A. Plaintiffs Will Suffer Irreparable Harm Absent A Preliminary Injunction ........ 16

B. Plaintiffs Are Likely to Succeed on the Merits ........ 17

1. *Accardi* Claim ........ 17
2. Administrative Procedure Act Claim ........ 19
3. Due Process Claim ........ 25
4. Violation of the INA and FARRA ........ 27

C. Balance of Hardships and Public Interest Favor a Preliminary Injunction ........ 27

D. A Preliminary Injunction Will Not Result in Damages to Defendants ........ 27

*V. CONCLUSION* ........ *28*

# TABLE OF AUTHORITIES

**Cases**

*A.C.R. v. Noem*, 809 F. Supp. 3d 103 (E.D.N.Y. 2025), *reconsideration denied*, No. 25-CV-3962 (EK)(TAM), 2026 WL 102611 (E.D.N.Y. Jan. 14, 2026) .......... 6
*Adrianza v. Trump*, 505 F. Supp. 3d 164 (E.D.N.Y. 2020), *opinion vacated on other grounds, appeal dismissed sub nom. Adrianza v. Biden*, No. 20-4165, 2021 WL 10140434 (2d Cir. Oct. 13, 2021) .......... 15
*Alzokari v. Pompeo*, 973 F.3d 65 (2d Cir. 2020) .......... 21
*Antonyuk v. Hochul*, 635 F. Supp. 3d 111 (N.D.N.Y. 2022) .......... 3
*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887 (2d Cir. 2015) .......... 3
*Cacchillo v. Insmed, Inc.*, 638 F.3d 401 (2d Cir. 2011) .......... 5
*Catholic Leg. Immigr. Network, Inc. v. Rubio*, 840 F. Supp. 3d 209 (S.D.N.Y. 2026) .......... 17
*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017) .......... 6, 10
*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .......... 5
*Coney Island Prep v. United States Dep't of Health and Human Servs.*, 506 F. Supp. 3d 203 (S.D.N.Y. 2020) .......... 16, 17
*D.V.D. v. United States Dep't of Homeland Sec.*, 192 F.4th 74 (1st Cir. 2026), *cert. granted sub nom.* No. 26-426, 2026 WL 2917860 (U.S. Sept. 29, 2026) .......... 23
*Do No Harm v. Pfizer Inc.*, 126 F.4th 109 (2d Cir. 2025) .......... 4
*Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975 (2d Cir. 1996) .......... 27
*E. Texas Baptist Univ. v. Sebelius,* No. CIV.A. H-12-3009, 2013 WL 4678016 (S.D. Tex. Aug. 30, 2013) .......... 15
*Exxon Corp. v. Federal Trade Comm'n*, 588 F.2d 895 (3d Cir. 1978), *overruled in part on other grounds by Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 138 (3d Cir. 2014) .......... 15
*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) .......... 4, 16
*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118 (2d Cir. 2020) .... 11, 14, 25
*Foucha v. Louisiana*, 504 U.S. 71 (1992) .......... 26
*Google LLC v. Does 1-25*, No. 26-CV-4982-VM, 2026 WL 1847420 (S.D.N.Y. June 26, 2026) 3
*Grannis v. Ordean*, 234 U.S. 385 (1914) .......... 26
*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .......... 6, 7
*J.G.G. v. Trump*, 772 F. Supp. 3d 18 (D.D.C. 2025). .......... 17
*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) .......... 11
*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .......... passim
*Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232 (S.D.N.Y. 2020) .......... 17, 27
*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) ... 11, 12
*Mathews v. Eldridge*, 424 U.S. 319 (1976) .......... 25
*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168 (2d Cir. 2005) .......... 7

*Montilla v. I.N.S.*, 926 F.2d 162 (2d Cir. 1991) .................................................................. 17
*Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120 (2d. Cir. 2020) ........... 6, 11, 12, 13
*Nat'l Res. Def. Council v. Nat'l Hwy. Traffic Safety Admin.*, 894 F.3d 95 (2d Cir. 2018) ........... 22
*New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286 (2d Cir. 2012) 7, 8, 20
*New York v. Admin. for Children and Families*, 833 F. Supp. 3d 361 (S.D.N.Y. 2026) ........ 19, 22
*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................... 4, 27
*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) ............................................................ 7, 8, 9
*Planned Parenthood of New York City, Inc. v. United States Dep't of Health and Human Servs.*, 337 F. Supp. 3d 308 (S.D.N.Y. 2018) ........................................................................ 27
*Ragin v. Harry Macklowe Real Est. Co.*, 6 F.3d 898 (2d Cir. 1993) ................................... 7, 9
*Ry. Lab. Executives' Ass'n v. Interstate Com. Comm'n*, 958 F.2d 252 (9th Cir. 1991) ............... 15
*Sidney Coal Co., Inc. v. Soc. Sec. Admin.*, 427 F.3d 336 (6th Cir. 2005) ................................... 15
*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ........................................... 17
*Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020) ............................................................... 25

**Statutes**

28 U.S.C. § 1391(e)(1) ...................................................................................... 14, 15
28 U.S.C. § 1654 ........................................................................................................ 24
5 U.S.C. § 704 ............................................................................................................ 19
5 U.S.C. § 706 ...................................................................................................... 21, 22
8 U.S.C. § 1229a(b)(4)(A) ........................................................................................... 24
8 U.S.C. § 1231 .......................................................................................................... 22
8 U.S.C. § 1231(b)(2)(E)(vii) ................................................................................ 22, 23
8 U.S.C. § 1231(b)(3)(A) ............................................................................................. 23
8 U.S.C. § 1362 .......................................................................................................... 24

**Other Authorities**

Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) ................................................................ 24
Kristi Noem, Sec'y of Homeland Security, Guidance Regarding Third Country Removals (Mar. 30, 2025), https://immigrationlitigation.org/wp-content/uploads/2025/04/43-1-Exh-A-Guidance.pdf [https://perma.cc/5NW9-X9HQ] ............................................................ 5, 18
National Detention Standards, United States Immigration & Customs Enforcement (2026), https://www.ice.gov/doclib/detention-standards/2026/nds2026.pdf [https://perma.cc/K7LM-DT3N] ......................................................................................................... 13, 18, 19
Nov. 3, 2026 Hr'g Tr. ........................................................................................... 17, 20
*Pakistan's Army Says it Killed 74 Militants in Raids on Their Hideouts*, ASSOCIATED PRESS (Nov. 13, 2026), https://www.washingtonpost.com/world/2026/11/13/pakistan-military-militants/72ee472e-df2e-11f1-912c-4fbb80d73f7f_story.html ................................ 2, 16, 18, 21

**Regulations**

28 C.F.R. § 200.1 ........ 24
8 C.F.R. § 1003.16 ........ 24
8 C.F.R. § 208.16 ........ 23
8 C.F.R. §§ 1208.16–18 ........ 24
8 C.F.R. §§ 208.16–18 ........ 24

**Constitutional Provisions**

U.S. Const., amend. V........ 25

Plaintiffs, by their attorneys, respectfully submit this memorandum of law in support of Plaintiffs' Motion for a Preliminary Injunction.

## I. INTRODUCTION

This case is about Defendants' plan to remove citizens and nationals of Afghanistan from the United States pursuant to a "Removal Plan" that places these individuals' lives and liberty in grave danger. The "Removal Plan" apparently relies on coordination between Pakistan and Afghanistan, even though Pakistan and the Taliban – the terrorist organization exercising *de facto* control over Afghanistan – are currently engaged in a proxy war, along the very border over which the Afghan Nationals would ostensibly be transported. This Removal Plan is not only unconstitutional and contrary to statute, but it reflects an alarming disregard for basic notions of human safety. This plan endangers the lives of people who have come to this country seeking the protection of our laws; people who have already been subject to prolonged detention; and people who have pending legal matters before our courts. The illogical nature of this plan – and the vague and contradictory ways in which Defendants have described it – is the essence of arbitrary and illegal government action. For these and other reasons, Plaintiffs respectfully request that this Court enjoin Defendants from carrying out the Removal Plan pending the outcome of this litigation.

### A. Plaintiffs Learn of the "Removal Plan"

The Plaintiffs in this action are four "John Doe" and two "Jane Doe" Plaintiffs (collectively, the "Afghan Nationals"), as well as their *pro bono* legal and social service provider, Project Rousseau, Inc. ("Project Rousseau"). *See* Dkt. No. 26 ("AC") ¶¶ 26-38. The Afghan Nationals fled Afghanistan following the Taliban takeover in 2021. *See* Declaration of Andrew C. Heinrich ("Heinrich Decl.") ¶¶ 80-85. Each Afghan National is detained in

Immigrations and Customs Enforcement ("ICE") custody and subject to a final order of removal to Afghanistan. *See id.*

In October of 2026, each of the Afghan Nationals learned that Defendants were planning to remove them to Afghanistan in the upcoming days and/or weeks. *See* AC ¶ 9; Heinrich Decl. ¶¶ 80-85. Around the same time, public sources began to report on the Removal Plan, through which the Defendants planned to remove Afghan Nationals to Pakistan, with the expectation that Pakistan would effectuate their onward removal to Afghanistan. *See, e.g.*, AC ¶ 11[1]; *see also* Heinrich Decl. ¶ 49.

The Removal Plan raises serious concerns, for a variety of reasons. *See* Heinrich Decl. ¶¶ 50, 55. First, Pakistan and the Taliban are currently engaged in a volatile proxy war – so any assumption that Pakistan would delicately turn the Afghan Nationals over to the Taliban is misplaced if not entirely unreasonable. *See* AC ¶ 53. Pakistan and the Taliban are engaged in a conflict along their border – a conflict that has seemingly escalated in the past ten days. *See id.*; *see also Pakistan's Army Says it Killed 74 Militants in Raids on Their Hideouts*, ASSOCIATED PRESS (Nov. 13, 2026), https://www.washingtonpost.com/world/2026/11/13/pakistan-military-militants/72ee472e-df2e-11f1-912c-4fbb80d73f7f_story.html. Moreover, the U.S. Department of State has itself described harrowing conditions in Pakistan. *See* AC ¶¶ 54-55. Indeed, Pakistan recently sentenced a Christian to death for defaming the Prophet – particularly concerning for Jane Does 1 and 2, Christians who fled Afghanistan for reasons relating to religion. *See* AC ¶ 57; Heinrich Decl. ¶¶ 80, 84. Even the Taliban have publicly warned against the Removal Plan. *See* AC ¶ 56.

---

[1] Citations to public sources are contained in the Amended Complaint, and Plaintiffs respectfully incorporate those citations by reference here.

In addition to obvious humanitarian concerns, the Removal Plan also raises particular concerns for New York-based non-profit Project Rousseau, in its capacity as a legal and social service provider to the Afghan Nationals. *See* Heinrich Decl. ¶¶ 9-11, 46, 50, 55, 72-74. This concern is two-fold. First, the Removal Plan frustrates Project Rousseau's ability to perform its ongoing work for the Afghan Nationals, impeding the organization's ability to carry out its responsibilities. *See id.* ¶¶ 72-78. Second, the Removal Plan has caused a diversion of Project Rousseau's resources away from its core activities, including activities for which the organization relies on funding. *See id.* ¶¶ 36-41, 45-48, 57-71.

### B. This Action

Project Rousseau initiated this action on the evening of November 2, 2026. *See* Dkt. No. 1. The procedural background in this case is set forth in the Court's November 6, 2026 Order, *see* Dkt. No. 21, at 8-11. Following the Court's November 6 Order, on November 9, 2026, Project Rousseau filed its Amended Complaint, which joined the Afghan Nationals as individual plaintiffs and added additional claims and allegations. *See* Dkt. No. 26.

## II. LEGAL STANDARD

"In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction." *Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 124 (N.D.N.Y. 2022). Plaintiffs must establish the following factors to obtain a preliminary injunction: "(1) irreparable harm; (2) a likelihood of success on the merits and/or sufficiently serious questions as to the merits; (3) the balance of equities tips in [the plaintiffs'] favor; and (4) a preliminary injunction serves the public interest." *Google LLC v. Does 1-25*, No. 26-CV-4982-VM, 2026 WL 1847420, at *2 (S.D.N.Y. June 26, 2026) (Marrero, J.); *see also Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015). "A showing of irreparable harm is

the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted). The last two factors – the balance of equities and public interest – "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III. THRESHOLD ISSUES

### A. This Court Has Jurisdiction to Enter a Preliminary Injunction

Quite simply, because the Afghan Nationals do not challenge their removal orders in this case, or even contest Defendants' right to effectuate their direct removal to Afghanistan, the INA jurisdiction-stripping provisions do not bar the relief that Plaintiffs seek. Because this Court has rejected the Governments' jurisdictional arguments, *see* Dkt. No. 21, at 13-19, Plaintiffs need not address those arguments here.

### B. The Plaintiffs Have Standing

#### 1. The Afghan Nationals Have Standing

"To establish individual standing, a plaintiff must show: (1) they suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical; (2) there is a 'causal connection between the injury and the conduct complained of'; and (3) it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025) (per curiam) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The evidentiary burden to establish standing "increases over the course of the litigation[,]" *id.* at 119 (citation omitted), but that burden "is at least as onerous" for a preliminary injunction as at the summary judgment stage. *Id.* at 114. To establish standing at the preliminary injunction stage, a plaintiff cannot rely on "mere allegations . . . but must set forth by affidavit or other evidence specific facts, which for

purposes of the summary judgment motion will be taken to be true." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (internal quotation marks and citation omitted).

As this Court has already noted, there is "little doubt [that] the Afghan Nationals have standing." Dkt. No. 21, at 23. The Afghan Nationals have suffered an "injury in fact" that is both "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560 (internal quotation marks and citation omitted). Their injuries are numerous and self-evident. They have been the subjects of a Removal Plan that purports to remove them– not to their country of origin– but to a country that is engaged in armed conflict with the terrorist organization controlling their country of origin, placing their lives, liberty and physical safety in clear danger. *See* AC ¶¶ 53-58. Moreover, the Removal Plan threatens to significantly impair their ability to litigate their ongoing legal proceedings and correspond with their legal and social services provider. *See* Heinrich Decl. ¶¶ 72-78. And, because Defendants have offered only vague and conflicting information concerning the Removal Plan and its nature, the Afghan Nationals have not received constitutionally adequate notice or an opportunity to challenge this plan. *See* Heinrich Decl. ¶¶ 89-97. Nor have they been afforded the even more basic protections set forth in DHS's March 2025 Guidance, which would require assurances from Pakistan that they would not be persecuted or tortured there, or, in the alternative notice and an opportunity to challenge their removal to Pakistan. *See* Kristi Noem, Sec'y of Homeland Security, Guidance Regarding Third Country Removals (Mar. 30, 2025), https://immigrationlitigation.org/wp-content/uploads/2025/04/43-1-Exh-A-Guidance.pdf [https://perma.cc/5NW9-X9HQ] (the "March 2025 Guidance").

These harms are not speculative; they do not rely on a "chain of contingencies[.]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Quite the contrary, each of the Afghan

Nationals is facing imminent removal; in fact, two of the Afghan Nationals received notice from the Government that they would be removed by November 3, 2026. *See* Heinrich Decl. ¶¶ 80, 85. Moreover, their fear of being removed in a "coordinated" effort that relies on the cooperation of Pakistan is concrete. While a threatened injury cannot be "conjectural[,]" a real risk of harm may satisfy the requirement of concreteness. *See A.C.R. v. Noem*, 809 F. Supp. 3d 103, 115 (E.D.N.Y. 2025), *reconsideration denied*, No. 25-CV-3962 (EK)(TAM), 2026 WL 102611 (E.D.N.Y. Jan. 14, 2026). Indeed, a "heightened fear of deportation or removal" may establish injury-in-fact. *Id.* That fear is particularly reasonable here, where even the Taliban have voiced concern over this plan. *See* AC ¶ 56.

Additionally, there is a "causal connection between the injury and the conduct complained of[,]" and it is likely, not merely speculative, that the relief sought will redress the injuries. *Lujan*, 504 U.S. at 560-61. Plaintiffs seek declaratory and injunctive relief that would halt the Removal Plan and declare it unlawful, *see generally* AC (Prayer for Relief); this remedy would directly redress Plaintiffs' injuries.

**2. Project Rousseau Has Organizational Standing**

To evaluate whether an organization has standing, courts "conduct the same inquiry as in the case of an individual[.]" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). To establish that an organization has suffered injury in fact, the organization must show that the defendant's conduct has "perceptibly impaired" its activities. *Id.* at 379. Accordingly, the Second Circuit has "repeatedly held that only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.'" *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) (citation omitted); *see also Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 129 (2d. Cir. 2020).

An organization may establish injury-in-fact by showing that "a policy has impeded, and will continue to impede, the organization's ability to carry out [its] responsibilit[ies]." *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012). An organization may likewise establish injury-in-fact by demonstrating that the defendants' conduct caused a diversion of resources. *See Havens Realty*, 455 U.S. at 379; *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011); *Ragin v. Harry Macklowe Real Est. Co.*, 6 F.3d 898, 905 (2d Cir. 1993). That resource diversion need not be monetary. *See, e.g.*, *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174-75 (2d Cir. 2005) (organization satisfied standing requirement where evidence reflected expenditure of additional resources to "locate, recruit, manage, train, and supply volunteers"). "[S]o long as the economic effect on an organization is real, the organization does not lose standing simply because the proximate cause of that economic injury is 'the organization's noneconomic interest in encouraging [a particular policy preference].'" *Nnebe*, 644 F.3d at 157 (quoting *Havens Realty*, 455 U.S. at 379 n. 20).

Here, the injury suffered by Project Rousseau is of both varieties: one that impedes its ability to carry out its responsibilities, and one that results in a diversion of resources. Project Rousseau is a 501(c)(3) non-profit that provides legal, educational, and social services. *See* Heinrich Decl. ¶¶ 6-8, 12-29. Project Rousseau is funded through a variety of public and private sources. *See id.* ¶¶ 36-38. For immigration legal services, the organization's staff members track their time, and the organization's funders reimburse the organization based on the amount of time that staff members spend on the funders' initiatives. *See id.* ¶ 38. Critically, Project Rousseau's funders only fund legal and social services work that supports (i) New York-based youth, (ii) the family members of New York-based youth, and/or (iii) individuals who entered the country as unaccompanied minors. *See id*. Project Rousseau's core work is legal and social

services for youth and families in the New York area – this is the work that has historically sat at the heart of the organization's core mission, and that is the work that funds the organization. *See id.* ¶¶ 6-8, 13-29, 38. Critically, the work that Project Rousseau has done for the Afghan Nationals is not work that receives funding or reimbursement. *See id.* ¶¶ 39-41, 45-46.

Because Project Rousseau has at least six clients who are subject to the Removal Plan, in recent weeks, Project Rousseau has had to expend additional resources to carefully track these clients' locations; communicate with them; and litigate their claims, in federal court, Immigration Court, and before the BIA. *See id.* ¶¶ 57-69. Moreover, in recent weeks, Project Rousseau has taken on additional engagements for Afghan clients, in an effort to protect these individuals from the Removal Plan. *See id.* ¶ 70. Project Rousseau has also expended significant resources to evaluate the claims of potential clients who may be similarly situated to the Afghan Nationals, from whom Project Rousseau has experienced an influx of requests in recent weeks. *See id.* ¶ 70-71. Moreover, the organization has expended resources to coordinate with other non-profits and formulate strategies to respond to the Removal Plan. *See id.* ¶¶ 60, 63-64. The time and labor that Project Rousseau has expended to respond to the Removal Plan is "far more than simply a setback to [its] abstract social interests." *Nnebe*, 644 F.3d at 157 (citation omitted). Rather, the Removal Plan has caused a real "economic effect on [the] organization[,]" *id.*, because it has required significant time and labor, most of which would otherwise have been spent on the organization's core activities, including activities for which the organization receives reimbursement. *See* Heinrich Decl. ¶¶ 57-58, 63-69.

The Removal Plan also impedes Project Rousseau's "ability to carry out [its] responsibilit[ies]." *New York Civil Liberties Union*, 684 F.3d at 295. The responsibilities affected here include: providing *pro bono* legal services even after a client is removed,

providing social services before a client is removed to assist them in planning for their removal, and coordinating with stakeholders (friends, family, and humanitarian aid workers) to help minimize risks to client safety and facilitate their arrival. *See* Heinrich Decl. ¶¶ 73-78. Because Project Rousseau has not had clear information concerning Pakistan's role in the Afghan Nationals' removal, the Removal Plan has impeded its ability to assist the Afghan Nationals in preparing for their removal. *See id.* ¶ 74. And, in light of the dangers presented by the Removal Plan, there is a real risk that, if clients are removed pursuant to the Removal Plan, Project Rousseau will lose contact with the Afghan Nationals, making it difficult if not impossible continue to assist them. *See id.* ¶¶ 76-78; *see also* AC ¶¶ 52-56.

Several Second Circuit cases are instructive here. First, in *Nnebe*, 644 F.3d at 150, 157-58, the Second Circuit found that the New York Taxi Workers Alliance ("NYTWA") had standing to challenge a policy under which taxi drivers' licenses were automatically suspended when they were arrested on criminal charges. The NYTWA supplied testimony demonstrating that the NYTWA "ha[d] expended resources to assist its members who face summary suspension by providing initial counseling, explaining the suspension rules to drivers, and assisting the drivers in obtaining attorneys." *Id.* at 157. The Second Circuit noted that, even if the NYTWA counseled "only a few suspended drivers . . . in a year, there is some perceptible opportunity cost expended by the Alliance[.]" *Id.* The court found that that opportunity cost amounted to a "perceptible impairment" necessary to establish injury in fact. *Id.* (quoting *Ragin*, 6 F.3d at 905). So too here. The work that Project Rousseau has done for the Afghan Nationals – and for other similarly situated clients and prospective clients who are not a part of this lawsuit – has resulted in a "perceptible opportunity cost" because it has prevented the organization from carrying out other responsibilities, including activities for which the organization would be reimbursed.

Similarly, in *Centro de la Comunidad Hispana*, 868 F.3d at 107, 109, the Second Circuit held that the Workplace Project ("Workplace"), an organization that "advance[s] the interests of day laborers[,]" had standing to challenge a town ordinance (the "Ordinance"). Workplace alleged that enforcement of the Ordinance would injure it in several ways, including that it would "require Workplace to divert resources from other of its activities to combat the effects of the Ordinance." *Id.* at 110. The Second Circuit noted that, even though the Ordinance had not yet been enforced, Workplace's injury was sufficiently concrete. *See id.* Specifically, the Ordinance made it more difficult for Workplace to meet with and organize laborers. *See id.* Moreover, the Ordinance would cause Workplace "to divert money from its other current activities to advance its established organizational interests[,]" and Workplace supplied testimony showing "that it has already had to devote attention, time, and personnel to prepare its response to the Ordinance." *Id.* at 110-11. So too here: the Removal Plan has and will continue to make it more difficult for Project Rousseau to service the Afghan Nationals, and the organization has already had to divert resources to respond to the Removal Plan. *See* Heinrich Decl. ¶¶ 57-78. The Second Circuit also found that Workplace's injuries were sufficiently imminent because it had "actively campaigned against the Ordinance"— manifesting more than just a "vague desire to engage in the activities that will subject it to its asserted injuries." *Centro de la Comunidad Hispana*, 868 F.3d at 111 (internal quotation marks and citation omitted). Here, Project Rousseau has already responded to the Removal Plan, and it will continue that work, *see* Heinrich Decl. ¶¶ 57-78, making its injuries are "actual" and "imminent[,]" not merely "hypothetical" or "conjectural." *Lujan*, 504 U.S. at 560 (internal quotation marks and citation omitted).

Finally, there is "a causal connection between the injury and the conduct complained of[,]" and it is likely, not merely speculative, that the relief sought will redress the injuries.

*Lujan*, 504 U.S. at 560-61. But for the Removal Plan, Project Rousseau would spend much of the time, labor, and other resources that it has and will spend responding to the Removal Plan on other activities, including activities for which the organization is reimbursed. *See* Heinrich Decl. ¶¶ 57-58. Declaratory and injunctive relief would allow Project Rousseau to direct these resources back to its core responsibilities, and would also enable Project Rousseau to more effectively support the Afghan Nationals in planning for and facilitating their removal. *See id.* ¶¶ 63-69, 72-74.

**C. Zone of Interests**

Even where a Plaintiff adequately pleads Article III standing, they must also fall within the "zone of interests" of the claims alleged. *Moya*, 975 F.3d at 130. "Whether a plaintiff comes within the 'zone of interests' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (cleaned up). "The core concern of the zone-of-interests doctrine is, after all, whether a plaintiff has a cause of action under the law invoked[.]" *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 129 (2d Cir. 2020).

In the APA context, the "zone of interests" inquiry is not "'especially demanding[.]'" *Lexmark*, 572 U.S. at 130 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) ("*Match-E*"). Indeed, the court need not find "any indication of congressional purpose to benefit the would-be plaintiff." *Match-E*, 567 U.S. at 225 (internal quotation marks and citation omitted). The Supreme Court "[has] always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Id.* The "zone-of-interests" inquiry "forecloses suit only when a plaintiff's interests

are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotation marks and citation omitted).

Plaintiff Project Rousseau is within the zone of interests of the claims that it brings.[2]

Several Second Circuit cases are again instructive. In *Moya*, 975 F.3d at 124-25, one of the plaintiffs was Youth Ministries for Peace and Justice, Inc. ("YMPJ"), a non-profit organization supporting immigrants. YMPJ alleged that the government's policies and practices led to the rejection of N-648 waivers for clients, causing diversion of the organization's resources. *See id.* The court held that, while YMPJ established standing, it did not fall within the zone of interests of the APA, the INA, and the Due Process Clause. *See id.* at 130. YMPJ's APA claim was based on an alleged violation of 8 U.S.C. § 1423(b)(1), which creates an exemption to naturalization requirements for people with a "physical or developmental disability or mental impairment[.]" *Id.* at 131 (quoting 8 U.S.C. § 1423(b)(1)). The court held that the effect of § 1423(b)(1) on YMPJ " is derived entirely from YMPJ's efforts to assist the disabled naturalization applicants who are directly regulated by the statute." *Id.* at 133 (footnote omitted). Accordingly, YMPJ was a "third party" outside the zone of interests of § 1423, *id.* at 133, and its "derivative interest in helping naturalization applicants to vindicate their rights" under § 1423 did not satisfy the zone of interests test, *id.* at 135.

Here, unlike in *Moya*, Project Rousseau's APA claim is not merely "derivative" of the Afghan Nationals' interests. *Moya*, 975 F.3d at 135. Project Rousseau's APA claims are based on conduct that allegedly violates statutes and regulations protecting the ability of clients to pursue their claims in court, with representation, if they so choose. *See* AC ¶¶ 114-18; *see also*

[2] To the extent there is any dispute that the Afghan Nationals are within the zone of interests in the claims they allege, Plaintiffs will address those arguments in their Reply.

28 U.S.C. § 1654, 8 U.S.C. § 1362; 8 U.S.C. § 1229a(b)(4)(A), 8 C.F.R. § 1003.16. Project Rousseau is not a "third party" to these provisions. *Moya*, 975 F.3d at 133. For instance, 8 C.F.R. § 1003.16(b) provides that "[t]he alien may be represented in proceedings before an Immigration Judge by an attorney or other representative of his or her choice[.]" 8 C.F.R. § 1003.16(b). This regulation directly protects the Afghan Nationals' ability to litigate their claims in immigration court with counsel, and a necessary corollary of that right is Project Rousseau's right to appear on its clients' behalf. Certainly, if a Project Rousseau attorney attempted to appear in immigration court on behalf of an Afghan National but were prohibited from doing so, she would cite this regulation in defense of her right. In this way, Project Rousseau's interest in continuing to represent the Afghan Nationals is not merely "a derivative interest in helping" the Afghan Nationals. *Moya*, 975 F.3d at 135.

The same is true of Project Rousseau's Due Process Claim under the *Accardi* Doctrine, which alleges that (as relevant to Project Rousseau), the Removal Plan violates ICE's own National Detention Standards, United States Immigration & Customs Enforcement (2026), https://www.ice.gov/doclib/detention-standards/2026/nds2026.pdf [https://perma.cc/K7LM-DT3N] (the "National Detention Standards"). Several of these standards specifically protect the attorney-client relationship. *See, e.g.*, *id.*, Standard 5.5.II.G. (Visits by Legal Representatives and Legal Assistants); Standard 5.4.II.E. (Direct Calls and Free Calls). Standard 2.9.II.R. (Legal Visits), Standard 2.9.II.W. (Telephone Access).[3] In this regard, Plaintiffs' *Accardi* claim is similar to that in *Fed. Defs.,* where the Federal Defenders brought an APA claim based on the

[3] Standard 2.9 pertains to detainees who have been placed in "Special Management Units" (SMUs) and segregated from the general population. *See id.*, Standard 2.9.I. However, these standards ostensibly set minimum standards of treatment that would *also* apply to detainees who have not been placed in SMUs, and thus provide a useful analogy. For instance, Standard 2.9.II.R. states that "[f]acilities shall not deny or restrict standard access to legal visitation for detainees in SMU." *Id.*

defendants' failure to comply with their own regulations concerning inmate-attorney visits. *See Fed. Defs.*, 954 F.3d at 127-28. The Second Circuit held that the Federal Defenders satisfied the zone-of-interest test. *See id.* at 132. Notably, the Second Circuit rejected the defendants' argument that the Federal Defenders were outside the protected zone of interests "because the BOP intended the regulations to benefit MDC inmates, not their attorneys[,]" reasoning instead that "the zone-of-interests test does not require an APA plaintiff to be the intended beneficiary of the law that he charges was violated." *Id.* at 131-32. The same is true here: while the Afghan Nationals might be the "intended beneficiar[ies]" of the National Detention Standards, Project Rousseau's interests "mirror the interests" that the standards "seek to protect[,]" including the interests of the Afghan Nationals in "having adequate access to legal counsel." *Id.*

For these reasons, Plaintiff Project Rousseau satisfies the zone-of-interests test.

**D. Venue is Proper in this District**

Where, as here, the defendants are "officer[s] or employee[s] of the United States or any agency thereof acting in his official capacity or under color of legal authority," as well as "agenc[ies] of the United States," venue is proper:

> in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e)(1). Venue is proper in this District pursuant to § 1391(e)(1)(C) because this action does not involve real property and Plaintiff Project Rousseau is incorporated in New York. *See* Heinrich Decl. ¶ 11. Because Project Rousseau's principal place of business is in Manhattan, *see id.* ¶ 10, venue is proper in the Southern District of New York. *See* 28 U.S.C. § 1391(c)(2) (entity-plaintiff's residency for venue purposes is "the judicial district in which it maintains its principal place of business[]").

Plaintiff Project Rousseau's residence is sufficient to establish venue. As Judge Kovner stated in *Adrianza v. Trump*, 505 F. Supp. 3d 164, 173 (E.D.N.Y. 2020), *opinion vacated on other grounds, appeal dismissed sub nom. Adrianza v. Biden*, No. 20-4165, 2021 WL 10140434 (2d Cir. Oct. 13, 2021), venue "turns on whether at least one of [the] New York plaintiffs can anchor venue." *See also id.* (citing 14D Charles Alan Wright & Arthur Miller, *Federal Practice & Procedure* § 3815 (4th ed.)). The Sixth Circuit addressed this issue squarely in *Sidney Coal Co., Inc. v. Soc. Sec. Admin.*, 427 F.3d 336 (6th Cir. 2005), and that decision is persuasive here. In *Sidney Coal*, the court held "that the residency requirement of 28 U.S.C. § 1391(e)(3) is satisfied if **at least one plaintiff** resides in the district in which the action has been brought." 427 F.3d at 345-46 (emphasis added). The court rejected the agency's argument that § 1391(e) required each plaintiff to reside in the judicial district. *Id.* at 344. As the Sixth Circuit noted, the purpose of § 1391(e) was "to make it more convenient for an aggrieved person to file suit against a federal entity[]" outside the District Court for the District of Columbia. *Id.* Other courts have interpreted § 1391(e) similarly. *See, e.g.*, *Exxon Corp. v. Federal Trade Comm'n*, 588 F.2d 895, 898-99 (3d Cir. 1978) ("There is no requirement [in § 1391(e)] that all plaintiffs reside in the forum district."), *overruled in part on other grounds by Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 138 (3d Cir. 2014); *Ry. Lab. Executives' Ass'n v. Interstate Com. Comm'n*, 958 F.2d 252, 256 (9th Cir. 1991); *E. Texas Baptist Univ. v. Sebelius,* No. CIV.A. H-12-3009, 2013 WL 4678016, at *7 (S.D. Tex. Aug. 30, 2013).

Plaintiffs may properly establish venue in this District pursuant to § 1391(e)(1).[4]

## IV. ARGUMENT

---

[4] If Project Rousseau is dismissed or withdraws from this case as a plaintiff, Plaintiffs reserve argument that venue may still be proper in this District pursuant to § 1391(e)(1)(B) because a "substantial part" of the events giving rise to the claims occurred in New York. *See* 28 U.S.C. § 1391(e)(1)(B).

### A. Plaintiffs Will Suffer Irreparable Harm Absent A Preliminary Injunction

Irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley*, 559 F.3d at 118 (internal quotation marks and citation omitted). The movant must show that the injury "is neither remote nor speculative," and that it "cannot be remedied by an award of monetary damages." *Coney Island Prep v. United States Dep't of Health and Human Servs.*, 506 F. Supp. 3d 203, 209 (S.D.N.Y. 2020) (Marrero, J.) (internal quotation marks and citation omitted).

Plaintiffs clear this threshold. The record now confirms that Defendants formulated a plan to remove the Afghan Nationals to Pakistan. *See, e.g.*, Dkt. No. 26-5, *M.B. v. Venturella, et al.*, Case No. 26-cv-03866-DLF, Hr'g Tr. 36:11-24 (D.D.C. Nov. 6, 2026) (The Court: "But they're admitting here she's going to Pakistan.")). That is so despite the fact that the Afghan Nationals are only subject to removal orders to *Afghanistan*; none of them has received written notice of their imminent removals to Pakistan; none of them has received details concerning the purported "coordination" that would occur between Pakistan and the Taliban; and Defendants have not represented that they have obtained credible assurances that the Afghan Nationals would not be persecuted or tortured in Pakistan. *See* Heinrich Decl. ¶¶ 51-54, 80-85, 89-97. The Amended Complaint cites numerous public sources, including U.S. Department of State materials, describing harrowing country conditions in Pakistan; the proxy war underway between Pakistan and the Taliban (which has even appeared to escalate in the last ten days); and Pakistan's recent brutality towards Christians and Afghan nationals. *See* AC ¶¶ 10, 12-13, 52-58; *see also Pakistan's Army Says it Killed 74 Militants in Raids on Their Hideouts*, ASSOCIATED PRESS, *supra*. These harms – including the risk of physical harm, persecution, and death – are

precisely the sort of "irreparable" harms which money damages cannot remedy. *See, e.g., J.G.G. v. Trump*, 772 F. Supp. 3d 18, 42 (D.D.C. 2025).

Moreover, Plaintiffs have shown that the harms are "neither remote nor speculative, but actual and imminent." *Coney Island*, 506 F. Supp. 3d at 209 (internal quotation marks and citation omitted). Each of the Afghan Nationals is facing imminent removal; specifically, two of the Afghan Nationals received notice from the Government that they would be removed on or before November 3, 2026. *See* Heinrich Decl. ¶¶ 80, 85. While the Government represented in this case on November 3, 2026, that "there are no charter flights or commercial flights for Afghan nationals to be removed this week at all[]" and "charter flights are typically planned further out[,]" Nov. 3, 2026 Hr'g Tr., 11:21-24, absent a preliminary injunction, Defendants would be free to carry out the Removal Plan before this Court has the opportunity to adjudicate its lawfulness.

Moreover, for the reasons set forth in Part III.B.2 *supra*, Project Rousseau has established an irreparable injury based on diversion of its resources and frustration of its mission. This is sufficient to establish irreparable harm warranting a preliminary injunction. *See, e.g.*, *Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 268 (S.D.N.Y. 2020).

**B. Plaintiffs Are Likely to Succeed on the Merits**

**1. *Accardi* Claim**

The *Accardi* doctrine holds that "government agencies are required to follow their own 'existing valid regulations.'" *Catholic Leg. Immigr. Network, Inc. v. Rubio*, 840 F. Supp. 3d 209, 246 (S.D.N.Y. 2026) (quoting *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)). The ambit of the *Accardi* doctrine "is not limited to rules attaining the status of formal regulations." *Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991). Plaintiffs are likely to prevail

in showing that the Removal Plan violates both the March 2025 Guidance and ICE's National Detention Standards. *See* March 2025 Guidance, *supra*; National Detention Standards, *supra*; *see also* AC ¶¶ 93-103.

The record before the Court now reflects that, despite informing at least two of the Afghan Nationals that they would be removed to *Afghanistan*, *see* Heinrich Decl. ¶¶ 80, 85, Defendants' actual plan was to effect a "coordinated" removal to Pakistan. *See, e.g.*, Dkt. No. 26-3, *M.B. v. Venturella,* Hr'g Tr. 15:16-17, 16:9-10; Dkt. No. 26-5, *id.* at 36:11-24. None of the Afghan Nationals received written notice that they would be removed to Pakistan, nor have Defendants represented that Pakistan has provided diplomatic assurances that the Afghan Nationals would not be persecuted or tortured in Pakistan, or that any such assurances– even if received– were deemed credible. *See* Heinrich Decl. ¶¶ 51-53. There is little question that this conduct violates the March 2025 Guidance, which requires either "diplomatic assurances that aliens removed from the United States will not be persecuted or tortured" in the third country, or (ii) provide Plaintiff with written notice of the country to which she will be removed in a language she understands, or the opportunity to express a fear of persecution or torture in that country. March 2025 Guidance, *supra*. Defendants' own protocol has not been followed, amounting to a violation of the *Accardi* Doctrine.

Plaintiffs are also likely to prevail on their claim that the Removal Plan violates the National Detention Standards. If the Afghan Nationals are removed to Pakistan, there is a high likelihood that Project Rousseau will lose contact with them. That conclusion is well-supported by public reporting on conditions in Pakistan discussed *supra*, including, for example, that Pakistan is currently engaged in a proxy war with the Taliban. *See* AC ¶¶ 10, 12-13, 52-58; *see also Pakistan's Army Says it Killed 74 Militants*, ASSOCIATED PRESS, *supra*. That conclusion is

also well-supported by Defendants' complete silence – at hearings in this case and others – as to how, if at all, Pakistan would safely deliver the Afghan Nationals to Afghanistan. *See, e.g.*, Dkt. No. 26-3, *M.B. v. Venturella,* Hr'g Tr. 16:9-10 ("So it's not going to -- it's a coordinated removal. That's about all I can say."). If the United States Government entrusts another government or party to deliver the Afghan Nationals to their country of origin, that would give rise to innumerable violations of the National Detention Standards. *See, e.g.*, Standard 5.5.I ("Facilities shall allow authorized persons to visit detainees, subject to security and operational constraints."); (Visitation), Standard 5.4.II.B ("The facility shall provide detainees with reasonable and equitable access to telephones and ACS during established waking hours[.]"). Of course, if detainees are delivered to the custody of a foreign government or party, it is almost guaranteed that these standards will not be upheld.

The record supports that Plaintiffs are likely to prevail on their *Accardi* claims.

**2. Administrative Procedure Act Claim**

**a) Final Agency Action**

Plaintiffs are likely to prevail in showing that the Removal Plan amounts to a "final agency action," 5 U.S.C. § 704, and that the Removal Plan is arbitrary and capricious and not in accordance with the law.

To constitute "final agency action," the Removal Plan "must satisfy two conditions." *New York v. Admin. for Children and Families*, 833 F. Supp. 3d 361, 386 (S.D.N.Y. 2026). "First, it must mark the consummation of the agency's decisionmaking process[]" and "[s]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (internal quotation marks and citation omitted). The record before the Court demonstrates that DHS's decision to effect a "coordinated" removal to Pakistan was

final and not "merely tentative[,]" *id.* (citation omitted). In short, the record reflects the following confirmations of the Removal Plan:

- On October 30, 2026, in litigation pending in another District Court, involving an Afghan national who is not a party to this lawsuit, the Government informed the Court that the November 3, 2026 flight "would not be a direct, non-stop flight to Afghanistan, and that the plane's final destination would be Pakistan with further transport onward to Afghanistan." Dkt. No. 26-2, ¶ 9.

- At the November 3, 2026 conference before the Court, counsel for the Defendants did not contest that it intended to remove the Afghan Nationals to Pakistan. *See* Nov. 3, 2026 Hr'g Tr. 8:18-21.

- Also on November 3, 2026, at a hearing before The Honorable Judge Dabney L. Friedrich in the United States District Court for the District of Columbia, counsel for the federal government described the government's plans to remove one of the Afghan Nationals to Afghanistan as a "coordinated removal" rather than a direct removal to Afghanistan. Dkt. No. 26-3, *M.B. v. Venturella,* Hr'g Tr. 15:16-17, 16:9-10.[5]

- At another hearing in *M.B. v. Venturella* on November 6, 2026, counsel for the federal government also represented that the Afghan National's removal would be to Pakistan, not to Afghanistan. *See* Dkt. No. 26-5, *M.B. v. Venturella, et al.*, Hr'g Tr. 36:11-24 (The Court: "But they're admitting here she's going to Pakistan.")).

These facts demonstrate that the Removal Plan was a final action and not merely speculative. Indeed, at the conference in this case before Judge Caproni on November 3, 2026, the government only guaranteed that the Removal Plan would not be effectuated through November 7, 2026 at midnight– just several days after the conference. *See, e.g.*, Nov. 3 Hr'g Tr. 15:5-8, 19:5-16. On this record, there is little question that the Removal Plan was a final agency action.

---

[5] *M.B. v. Venturella, et al.*, Case No. 26-cv-03866-DLF (the "D.C. Action") was initiated by one of the Afghan National plaintiffs in this case in the District of Columbia on November 2, 2026. On November 6, 2026, Judge Friedrich noted that M.B. was covered by the injunction of this Court and ordered the parties to inform the Court if the injunction is lifted or stayed. *See M.B.*, Case No. 26-cv-03866-DLF (D.D.C. Nov. 6, 2026) (minute order). Because the complaint in this action has now been amended to include M.B. as a named Plaintiff, counsel understands that these cases may be joined or consolidated at the courts' discretion, or that voluntary dismissal of the D.C. Action may be appropriate.

#### b) Arbitrary and Capricious

"An agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Alzokari v. Pompeo*, 973 F.3d 65, 70 (2d Cir. 2020) (internal quotation marks and citation omitted); *see also* 5 U.S.C. § 706(2).

The Removal Plan is arbitrary and capricious because it places the lives of the Afghan Nationals in imminent danger, and there is no evidence that Defendants have considered these dangers. These dangers are publicly documented and have been discussed *supra*. *See* AC ¶¶ 10, 12-13, 52-58; *see also Pakistan's Army Says it Killed 74 Militants*, ASSOCIATED PRESS, *supra*. There is no evidence that Defendants considered the safety of the Afghan Nationals in formulating the Removal Plan. Even though the record now confirms a "coordinated" Removal Plan to Pakistan, see Part IV.B.2(b) *supra*, Defendants have, at various junctures, obfuscated their true intentions. For example:

- On November 4, 2026, one of the Afghan Nationals was informed by an ICE Detention and Deportation Officer in a sworn declaration that the government did not have a plan to remove that individual to Pakistan, and that no such plan ever existed. *See* Heinrich Decl. ¶ 88.

- On November 6, 2026, at a hearing before Judge Friedrich in *M.B. v. Venturella*, counsel for the federal government represented that the Removal Plan is a first-country removal. *See* Dkt. No. 26-4, *M.B. v. Venturella*, Hr'g Tr. 7:2-8.

- On November 9, 2026, in a case involving one of the Afghan Nationals, an ICE Supervisory and Deportation Officer affirmed that that individual had been "manifested for a Special High-Risk Charter (SHRC) flight to Afghanistan" that had been "scheduled for November 3, 2026[]" but "ultimately postponed." *See* Dkt. No. 26-6, ¶ 4.

These obfuscations – and Defendants' utter failure to be forthcoming about their plans to remove the Afghan Nationals in a "coordinated" removal – is the very essence of arbitrary government conduct.

**c) Contrary to Law**

Pursuant to 5 U.S.C. § 706(2), the court shall set aside agency action that is "not in accordance with law[]" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A),(C). "It is well settled that an agency may only act within the authority granted to it by statute." *Nat'l Res. Def. Council v. Nat'l Hwy. Traffic Safety Admin.*, 894 F.3d 95, 108 (2d Cir. 2018). Moreover, agency action "must be set aside as contrary to law when it is inconsistent with regulations." *Admin. for Children and Families*, 833 F. Supp. 3d at 396 (internal quotation marks and citation omitted).

Plaintiffs are likely to prevail in showing that the Removal Plan violates numerous statutes and regulations:

**<u>8 U.S.C. § 1231, FARRA, and Implementing Regulations</u>**

8 U.S.C. § 1231 governs the "[d]etention and removal of aliens ordered removed[.]" 8 U.S.C. § 1231. The Removal Plan violates § 1231 in several respects.

*First*, nothing in the statute authorizes the Government to conduct a "coordinated" removal of the sort that Defendants formulated here. *See generally* 8 U.S.C. § 1231. The countries to which noncitizens may be removed are described in 8 U.S.C. § 1231(b)(1) and § 1231(b)(2). In certain circumstances, the Attorney General is authorized to conduct a third-country removal, but only where it is "impracticable, inadvisable, or impossible to remove the alien to each country described" in earlier subprovisions. 8 U.S.C. § 1231(b)(2)(E)(vii). In such cases, the noncitizen shall be removed to "another country whose government will accept the

alien into that country." *Id.* Here, there is no evidence that Pakistan "will accept" the Afghan Nationals. *See id.* In fact, Plaintiffs have not received any information concerning Pakistan's role in the Afghan Nationals' removal, including whether or how they will actually be transported from Pakistan to Afghanistan. *See* Heinrich Decl. ¶¶ 89-91, 94. To the extent the Afghan Nationals are removed to Pakistan, such removal violates § 1231(b)(2)(E)(vii) because there is no evidence that Pakistan "will accept them [into their] country[,]" and to the contrary, there is a real risk that they may be used as political pawns between Pakistan and the Taliban.

*Second*, the Removal Plan violates 8 U.S.C. § 1231(b)(3), under which "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. § 208.16. As the First Circuit recently noted, " § 1231(b)(3) **categorically** prohibits DHS from removing eligible class members to a country (including a third country) if DHS decides that they would face persecution there based on a protected characteristic." *D.V.D. v. United States Dep't of Homeland Sec.*, 192 F.4th 74, 95 (1st Cir. 2026), *cert. granted sub nom.* No. 26-426, 2026 WL 2917860 (U.S. Sept. 29, 2026) (emphasis added). Regardless of how Defendants frame the "coordinated" removal, they have already admitted that it is a removal to Pakistan. *See, e.g.*, Dkt. No. 26-5, *M.B. v. Venturella*, Hr'g Tr. 36:11-24. Again, based on publicly available evidence of alarming country conditions in Pakistan; the proxy war waging on between Pakistan and the Taliban; and Pakistan's recent mistreatment of Christians and Afghan nationals, the Afghan Nationals are likely to prevail in showing that their life or freedom would be threatened in Pakistan for reasons such as their religion, nationality, and/or political opinion. *See* AC ¶¶ 10, 12-13, 52-58; *see also* Heinrich Decl. ¶¶ 80-85.

*Third*, the Removal Plan also violates the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231). Under FARRA, an individual may not be removed "to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." 8 U.S.C. § 1231 Note ("United States Policy With Respect to Involuntary Return of Persons in Danger of Subjection to Torture"); *see also* 8 C.F.R. §§ 208.16–18, 1208.16–18; 28 C.F.R. § 200.1. For the same reasons that the record supports a likely violation of § 1231(b)(3), it also reflects "substantial grounds" for believing that the Afghan Nationals "would be in danger of being subjected to torture[]" in Pakistan.

**<u>Statutes and Regulations Concerning the Privilege of Representation</u>**

The Removal Plan is also contrary to law because it would curtail the Afghan Nationals' ability to litigate their ongoing proceedings in United States courts and impede communications with legal and social services providers such as Plaintiff Project Rousseau. These privileges are enshrined in statutes and regulations. *See, e.g.*, 28 U.S.C. § 1654, 8 U.S.C. § 1362; 8 U.S.C. § 1229a(b)(4)(A), 8 C.F.R. § 1003.16. For instance, 8 U.S.C. § 1229a(b)(4)(A), which governs removal proceedings, provides that "the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings[.]" 8 U.S.C. § 1229a(b)(4)(A); *see also* 8 C.F.R. § 1003.16. Critically, several of the Afghan Nationals have motions pending before the Immigration Court and/or the BIA. *See* Heinrich Decl. ¶¶ 80, 82, 84. For similar reasons discussed in Section III.C *supra*, Plaintiffs are likely to prevail in showing that the Removal Plan's disregard for statutes and regulations protecting the Afghan Nationals' privilege of representation amounts to an APA violation. *See,*

*e.g.*, *Fed. Defs.*, 954 F.3d at 131-32 (holding that district court erred in dismissing APA claims based on the Bureau of Prisons' failure to comply with its regulations concerning attorney-inmate visitation).

**3. Due Process Claim**

Plaintiffs are also likely to prevail in showing that the Removal Plan violates their right to procedural due process. The Removal Plan violates the Due Process Clause because the Afghan Nationals have not been afforded basic information concerning their removal to Pakistan, or Pakistan's role in their removal. To the contrary, the record is rife with contradictions concerning the actual nature of the Removal Plan.

The Due Process Clause of the Fifth Amendment provides in relevant part that "[n]o person shall be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V. The Second Circuit applies the three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) to evaluate procedural due process claims: "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) (cleaned up).

As to the first factor, the private interests at stake – the Afghan Nationals' life, liberty, and physical safety – is extremely significant. *See Velasco, id.* (stating that the "interest in being free from imprisonment" is "the most significant liberty interest there is."). There is a real risk that, if removed to Pakistan, the Afghan Nationals' lives will be in danger. *See, e.g.*, AC ¶¶ 53-58. Moreover, while Defendants have stated that the Removal Plan would involve "further

transport onward [from Pakistan] to Afghanistan[,]" Dkt. No. 26-2 ¶ 9, it is not clear who would conduct this transport. It is likely that such transport would place the Afghan Nationals in the custody of someone other than the United States Government, again implicating significant liberty interests. *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.").

Second, the risk of erroneous deprivation is high, and additional safeguards would be valuable. As described *supra*, the Removal Plan has not complied with the basic safeguards set forth in Defendants' own March 2025 Guidance. But even more fundamentally, Defendants have only offered vague and conflicting information concerning the nature of the Removal Plan, frustrating the Afghan Nationals' right to be heard on their concerns about their removal to Pakistan. *See Grannis v. Ordean*, 234 U.S. 385, 394 (1914) ("The fundamental requisite of due process of law is the opportunity to be heard."). The record before the Court contains numerous contradictions. For example, at times, Defendants have described the removal plan as a "first country" removal, and at others, they have described it as a "coordinated" removal involving onward transport to Afghanistan. *Compare* Dkt. No. 26-4, *M.B. v Venturella*, Hr'g Tr. 7:2-8, *with* Dkt. No. 26-3, *M.B. v. Venturella,* Hr'g Tr. 15:16-17, 16:9-10. Moreover, while it is now confirmed that the November 3, 2026 charter flight (for which at least two of the Afghan Nationals were manifested) would have deposited them in Pakistan, one of the Afghan Nationals was informed in a sworn declaration that there was no plan to remove her to Pakistan. *Compare* Dkt. No. 26-5, *M.B. v. Venturella*, Hr'g Tr. 36:11-24 *with See* Heinrich Decl. ¶ 88. Because Defendants have not even offered a consistent narrative concerning the Removal Plan, the risk of erroneous deprivation is high.

Third, for the reasons set forth in Part IV.C *infra*, the government's interest in effectuating the Removal Plan, if any, is low.

#### 4. Violation of the INA and FARRA

For the same reasons articulated in Section IV.B.2(c), Plaintiffs are likely to prevail in showing that the Removal Plan violates the INA and FARRA.

### C. Balance of Hardships and Public Interest Favor a Preliminary Injunction

These last two factors weigh in favor of a preliminary injunction. "As an initial matter, there is no public interest in allowing Defendants to proceed with unlawful, arbitrary, and capricious executive or agency actions that exceed their statutory authority." *Make the Rd. New York*, 475 F. Supp. 3d at 269; *see also Planned Parenthood of New York City, Inc. v. United States Dep't of Health and Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018). While there "is always a public interest in prompt execution of removal orders[,]" *Nken*, 556 U.S. at 436, neither the government nor the public have any conceivable interest in effectuating removal missions that involve sending detainees into an active combat zone– particularly where, as here, the government has refused to share basic information concerning when, how, or if the detainees will be delivered back to their home country.

### D. A Preliminary Injunction Will Not Result in Damages to Defendants

Plaintiffs respectfully request that the Court exercise its discretion to dispense with the bond requirement because the proposed injunction will not cause Defendants to incur any conceivable financial damages and might save Respondents the costs involved in facilitating the return of individuals wrongfully removed from the United States. *See Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (noting that court has "wide discretion in the matter of security" pursuant to Federal Rule of Civil Procedure 65(c) (citation omitted)).

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction preventing Defendants from removing the Afghan Nationals from the United States to Afghanistan (absent evidence of a direct removal); to Pakistan; or to Afghanistan by way of Pakistan, pending the outcome of this litigation.

Dated: November 17, 2026

Respectfully submitted,

*/s/ Andrew Heinrich*
Andrew Heinrich
*Supervising Attorney*
Project Rousseau, Inc.
1560 Broadway, Suite 805
New York, NY 10036
Email: Andrew.Heinrich@projectrousseau.org
Phone: +1 (917) 734-7219

*/s/ Olivia Natale*
Olivia Natale
*Staff Attorney*
Project Rousseau, Inc.
1560 Broadway, Suite 805
New York, NY 10036
Email: Olivia.Natale@projectrousseau.org
Phone: +1 (860) 966-5805

**Certificate of Word Count Compliance**

I, Olivia Natale, hereby certify pursuant to Local Civil Rule 7.1(c) that this memorandum of law was prepared using Microsoft Word and the document contains 8,747 words as calculated by the application's word counting function, excluding the parts exempted by Local Civil Rule 7.1(c).

Dated: November 17, 2026

*/s/Olivia Natale*