**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

PROJECT ROUSSEAU, INC.,
JOHN DOE 1-4, and JANE DOE 1-2,

Plaintiffs,

v.

DAVID J. VENTURELLA, MARKWAYNE MULLIN, TODD BLANCHE, MARCO RUBIO, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, and U.S. DEPARTMENT OF HOMELAND SECURITY,

Defendants.

Case No. 26-cv-9602-VM

**Declaration of Andrew C. Heinrich**

I, Andrew Heinrich, declare as follows:

1. I am the Founder, Executive Director, and Supervising Attorney of Project Rousseau, Inc. ("Project Rousseau").
2. I am a member in good standing of this Court.
3. I represent Plaintiffs in the above-captioned matter.
4. I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

***Project Rousseau's Founding and Core Mission***

5. I founded Project Rousseau in 2011.
6. I founded Project Rousseau to support young people in the New York City area, and their families. That was and remains Project Rousseau's core mission. Specifically, our mission is to "empower[] youth in communities in the greatest need."[1]

[1] https://projectrousseau.org/

7. Since Project Rousseau's founding, the organization has realized its mission by providing academic support and mentorship to young people in the New York City area. Project Rousseau also helps young people participate in new cultural experiences, obtain career opportunities and exposure, and give back to the community through community service. All of this work continues today, and it remains core to Project Rousseau's mission and operations.

8. Project Rousseau's services and programs grow in response to the needs of the youth and families it services.

9. Project Rousseau is headquartered in New York City at 1560 Broadway, Suite 805, New York, NY 10036.

10. Project Rousseau's principal place of business is 1560 Broadway, Suite 805, New York, NY 10036.

11. Project Rousseau is incorporated under New York law.

12. Project Rousseau is a 501(c)(3) non-profit organization.

***Project Rousseau's Legal Services***

13. In recent years, Project Rousseau has also started to provide full-scope, *pro bono* legal services.

14. The decision to offer *pro bono* legal services was inspired by youth and families served by Project Rousseau, and the difficulties they were having in securing *pro bono* representation. After numerous individuals took years to find counsel, Project Rousseau decided to undergo the process to begin offering those services itself.

15. Project Rousseau first began to provide legal services in or around October 2022. Around this time, New York City experienced an unprecedented influx in migration,

leading to a booming demand for immigration legal services and other related humanitarian services.

16. It was clear to me and others working for our organization that so many of the young people that we serve were deeply affected by the immigration system. I felt that it was core to our mission to step in at this time of need. We offered full-scope legal services to many of the asylum seekers who arrived in New York City from the Southern border beginning in 2022.[2] We also provided other social services to these newcomers, such as school enrollment, navigating the homeless shelter system, and accessing healthcare services.

17. While we are no longer confronting the unprecedented influx that we saw in 2022, the demand for immigration legal services remains extremely high. Project Rousseau continues to provide full-scope *pro bono* immigration legal services to young people and their families.

18. Project Rousseau's immigration legal services commitments have grown considerably in recent years. Our immigration legal services work now comprises a core part of the work we do.

19. Many of our clients seek asylum, withholding of removal, and protection under the Convention Against Torture in the United States. In these cases, we provide representation before United States Citizenship and Immigration Services ("USCIS") and the Immigration Court.

---

[2] *Asylum Seeker Funding Tracker*, NYC MAYOR'S OFFICE OF MANAGEMENT AND BUDGET, https://www.nyc.gov/content/omb/pages/what-we-do/asylum-funding-tracker (discussing 2022 influx of asylum seekers).

20. Many of our clients are eligible for Special Immigrant Juvenile Status ("SIJS"). In those cases, we will provide representation in Family Court,[3] as well as before USCIS and the Immigration Court.

21. Project Rousseau also represents clients on appeals to the Board of Immigration Appeals ("BIA") and the Courts of Appeals.

22. As discussed *infra*, Project Rousseau also provides *habeas corpus* representation in federal court to certain detained individuals, as well as representation in bond proceedings before the Immigration Court.

***Social Services***

23. In addition to Project Rousseau's Legal Services, the organization continues to provide social services and educational programming. These services are very broad.

24. Project Rousseau's social services are aimed at improving the lives of young people and their families and generally positioning young people for success in school and beyond.

25. The activities described herein are not exhaustive.

26. Project Rousseau provides individualized case management and practical assistance to young people and their families, many of whom reside in New York City shelters.

27. Project Rousseau staff, interns, and volunteers assist families in accessing emergency food and clothing, securing stable housing, navigating the New York City shelter system, enrolling in public benefits and health insurance, and obtaining medical and mental health services.

[3] SIJS requires predicate determinations from a Family Court judge, which is why these engagements require family court representation.

28. Project Rousseau also helps families address barriers to school enrollment and attendance, connect with community resources, and navigate government agencies and social-service providers.

29. Through ongoing case management, referrals, and direct advocacy, Project Rousseau helps young people and families meet their basic needs, maintain stability, and ensure that children can continue their education despite significant economic and immigration-related challenges.

***Organizational Structure***

30. Project Rousseau employs four attorneys and two Department of Justice Accredited Representatives ("DOJ Accredited Representatives"), as well as a team of paralegals and other assistants who support our attorneys and representatives.

31. Project Rousseau also employs staff members who work predominantly or, in some cases, exclusively on non-legal matters, such as providing music lessons to students.

32. Consistent with Project Rousseau's mission of supporting young people, at various points throughout the year, Project Rousseau engages law school, college, and high school interns and volunteers, on both a part-time and full-time basis. These students work on a variety of tasks appropriate to their age and education level.

33. Project Rousseau's staff members work out of Project Rousseau's headquarters in New York, NY. Staff members occasionally work remotely, but most of them also live in the New York City area.[4]

---

[4] Project Rousseau also engages one remote staff member through a third-party staffing agency that recruits and provides remote personnel based in Latin America. The individual works under Project Rousseau's day-to-day direction and supervision, while the agency provides staffing and administrative support. That staff member does not work on matters relating to the Afghan Nationals.

34. All of Project Rousseau's legal files and documents are stored at Project Rousseau's headquarters in New York, NY.

35. All non-legal files and documents relating to the social services that Project Rousseau offers are stored at Project Rousseau's headquarters in New York, NY.

***Project Rousseau's Funding***

36. Project Rousseau receives a combination of government and private funding to pay its staff and support its operational activities.

37. The majority of Project Rousseau's funding for immigration legal services is received from a combination of the New York City Mayor's Office of Immigrant Affairs ("MOIA"), New York State's Office of New Americans, and New York City Council Discretionary Funding (the "Funders").

38. The Funders reimburse Project Rousseau for legal and social services offered to New York-based youth; the families of New York-based youth; and unaccompanied minors. Project Rousseau's staff members track their time, and reimbursements from the Funders are based on the amount of time that Project Rousseau staff members spend on the Funders' initiatives.

39. This means that resources – including human capital resources – spent on projects other than those that support New York-based youth (or their families), or unaccompanied minors, are "unrecoverable." In other words, the organization does not get reimbursed for these projects.

40. These projects are conducted at an operational loss because we expend human resources and other capital on these projects without reimbursement. The funds spent are from

unrestricted donations that I had previously planned to allocate to other services and programs.

41. However, on certain occasions, I will authorize staff to expend time, labor and other resources on unrecoverable activities, where I feel that the work is consistent with core values such as upholding human dignity, safety, and liberty.

***Project Rousseau's Work with Detained Clients***

42. Starting in or around 2025, Project Rousseau began to represent detained immigrants pursuing immigration-related *habeas corpus* relief in federal court.

43. Some of the clients that we represent in *habeas corpus* actions are clients who generate organizational funding – with some exceptions, those would be detained clients with young children, who reside or have recently resided in the New York area.

44. The demand for Project Rousseau's *habeas corpus* representation is extremely high.

45. Project Rousseau began to represent certain adult clients, outside the New York area, who we found to have highly compelling cases and particularly vulnerable personal circumstances. Our work for these clients does not get reimbursed.

46. That includes the Afghan Nationals; because they are adults detained outside of New York, who did not reside in New York before they were detained, and did not enter as unaccompanied minors, our organization does not receive *any* reimbursement for the time, labor, or other resources that we expend on servicing these clients.

47. As a non-profit serving highly underserved populations, the demands on my time and my staff's time are very high.

48. We took on the Afghan Nationals as clients because we found their circumstances extremely compelling. They fled Afghanistan following the Taliban takeover in 2021.

They were persecuted in Afghanistan based on their personal characteristics and/or, in some cases, because they or their family members had supported the Western-backed Islamic Republic of Afghanistan. They came here seeking the protection of our laws, and found themselves in prolonged immigration detention.

***Project Rousseau Learns of the Removal Plan***

49. I learned of the Removal Plan through public reporting, shortly before our first clients were due to be removed pursuant to that plan in early November of 2026.

50. Upon learning about this "Removal Plan," my staff and I were extremely concerned for the safety and wellbeing of our clients. We understood that our clients could, effectively, be sent to Pakistan at any moment, under the guise of a first-country removal to Afghanistan.

51. Neither Project Rousseau nor its clients had received any written notice that the Afghan would be removed to Pakistan, nor any basic information concerning how, when, or by whom the Afghan Nationals would be transported to Afghanistan via Pakistan. That lack of information certainly compounded my concern.

52. I am not aware that Defendants have represented that Pakistan has provided diplomatic assurances that the Afghan Nationals would not be persecuted or tortured in Pakistan, nor that any such assurances– even if received– were deemed credible.

53. I am not aware of any public record that Pakistan has provided diplomatic assurances that the Afghan Nationals would not be persecuted or tortured in Pakistan, nor that the Department of State had deemed any such assurances– even if received– to be credible.

54. I am not aware of any public record that Pakistan would treat the Afghan Nationals in accordance with the 1951 Refugee Convention, the Convention Against Torture, or any

other international human rights norms or obligations. To the extent that such assurances or commitments exist, evidence readily available to the United States government demonstrates that they are not credible.

55. The Removal Plan raised immediate concerns for me and my team about our clients' health and safety. Two of the Afghan Nationals are Christian, and Pakistan recently sentenced a Christian to death for defaming the Prophet.[5] Moreover, Pakistan is currently engaged in a volatile proxy war with the Taliban, the terrorist organization that exercises *de facto* control over Afghanistan.[6] The U.S. Department of State has a Level 3 Travel Advisory in place for Pakistan, advising people to reconsider travel to Pakistan "due to armed conflict, terrorism, crime, and kidnapping."[7] The U.S. Department of State has described, in its 2024 Human Rights Report for Pakistan, "[s]ignificant human rights issues[,]" including, *inter alia*, "unlawful or arbitrary killings; disappearances; torture or cruel, inhuman, or degrading treatment or punishment[.]"[8] Even the Taliban have

---

[5] *See* Beth Bailey, *Pakistan's Top Court Upholds Christian Man's Death Sentence for Blasphemy*, FOX NEWS (Oct. 27, 2026), https://www.foxnews.com/world/pakistans-top-court-upholds-christian-mans-death-sentence-blasphemy.

[6] *See* Elian Peltier, *'Open War' Between Afghanistan and Pakistan Adds a Volatile Element*, N.Y. TIMES (Oct. 22, 2026), https://www.nytimes.com/2026/10/22/world/asia/afghanistan-pakistan-proxy-war.html; A.K. Wazir, *et al.*, *Pakistan Warns Afghanistan of "Unbearable Punishment" as Clashes Persist Along Border*, ASIA NEWS NETWORK (Nov. 2, 2026), https://asianews.network/pakistan-warns-kabul-of-unbearable-punishment-as-clashes-persist-along-border/ [https://perma.cc/6ZA6-9K54].

[7] *See Pakistan Travel Advisory*, U.S. DEP'T OF STATE (June 16, 2026), https://travel.state.gov/en/international-travel/travel-advisories/pakistan.html?gad_source=1&gad_campaignid=44031958015&gbraid=0AAAAqbBk5tUfx_6uSRwgHrJjr3T2WR4U&gclid=CjwKCAiAtbvXBhB_EiwAjwv9JiFlD4RI8OTsq06hRXx2qkNyWR8GjIiSbAafXhsH-iLDnglYuoTAdBoCWxIQAvD_BwE.

[8] *See Pakistan 2024 Human Rights Report*, U.S. DEP'T OF STATE (2024), https://www.state.gov/wp-content/uploads/2025/07/624521_PAKISTAN-2024-HUMAN-RIGHTS-REPORT.pdf.

publicly warned against the Removal Plan.[9] And Afghan migrants in Pakistan have recently been forcibly returned to Afghanistan by the Pakistani government, pursuant to a directive issued by Pakistan's Ministry of Interior on June 28, 2026 that instructed the detention and deportation of Afghan nationals in Pakistan without valid documentation.[10] Additionally, Afghan nationals in Pakistan have reported harassment, torture, and mistreatment by the Pakistani police.[11]

56. For these and other reasons, upon learning of the Removal Plan, Project Rousseau quickly began to expend additional resources to track the Afghan Nationals; communicate with them; and litigate their claims.

***Resources Expended to Respond to the Removal Plan***

57. Providing legal services to the Afghan Nationals is a costly endeavor for Project Rousseau, for several reasons.

58. First, as discussed *supra*, the organization does not get reimbursed for this work – so we are already performing this work at a loss. Were it not for this work, my colleagues would be undertaking other work during these hours, most of which would be reimbursable.

59. Second, because these clients are subject to final orders of removal to Afghanistan, they can be removed at any juncture.[12] Accordingly, Project Rousseau expends extra

---

[9] *See* Gavin Blackburn, *Taliban Voices 'Serious Concern' over US Plans to Deport Afghans via Pakistan*, EURONEWS (Nov. 2, 2026), https://www.euronews.com/2026/11/02/taliban-voices-serious-concern-over-us-plans-to-deport-afghans-via-pakistan.

[10] *See Pakistan: Afghan migrants face harassment, torture, detention*, GENOCIDE WATCH (Nov. 3, 2026), https://www.genocidewatch.com/single-post/pakistan-afghan-migrants-face-harassment-torture-detention [https://perma.cc/SR57-62XX].

[11] *Ibid.*

[12] Of course, their removal has been temporarily halted by this Court's November 6, 2026 Order. *See* Dkt. No. 21.

resources to stay in close contact with these individuals, including (but not limited to) that paralegals and other support staff make frequent calls to the detainees and to their detention centers. Tracking their locations has become particularly challenging, but important, in recent months because, beginning around September 2026, their locations were no longer visible in ICE's Online Detainee Locator System ("ODLS").[13]

60. Project Rousseau has implemented a variety of strategies to keep track of these individuals. In addition to staying in contact with the Afghan Nationals to monitor their location, Project Rousseau staff will also call personnel at their detention center periodically to inquire if the detainee is still at that facility. This helps Project Rousseau track potential removals or staging activity.[14] Project Rousseau also monitors flight activity to track potential removals or staging activity. Moreover, Project Rousseau coordinates closely with other non-profit organizations to understand potential removal missions and staging activity.

61. Project Rousseau's efforts to track the Afghan Nationals became more involved and time-consuming in recent weeks, when Project Rousseau learned of the "Removal Plan,"

---

[13] Aaron Reichlin-Melnick, *ICE Begins Electronically 'Disappearing' People in Custody: What You Need to Know*, American Immigration Council (Sept. 23, 2026), https://www.americanimmigrationcouncil.org/blog/ice-electronically-disappears-detainee-locator/.

[14] "Staging" is a term that refers to the process in which detainees are transferred either (i) between detention centers and/or (ii) from detention centers to airports ahead of planned removal missions. As ICE explains, "ERO uses contracted charter flights to transfer detainees throughout the United States to various ICE-managed detention facilities in preparation for removal, or to return individuals to their countries of origin. In addition, depending on geography, the number of persons being removed, and other case specifics, ERO also removes detained aliens via commercial airlines. Detainees may be escorted or unescorted on these commercial flights." Remove, Immigration & Customs Enforcement, https://www.ice.gov/remove [https://perma.cc/JA6E-5FNR].

through which the Defendants planned to remove the Afghan Nationals to Pakistan, with the expectation that Pakistan would effectuate their onward removal to Afghanistan.

62. The core team working to protect our clients from the Removal Plan consists of myself, one Staff Attorney, one Department of Justice Accredited Representative, two paralegals (including one senior paralegal), one volunteer, and one part-time worker (the "Removal Plan Response Team").

63. In recent weeks, I have directed the Removal Plan Response Team to spend time on various tasks relating to tracking the Afghan Nationals; communicating with them; litigating their claims; evaluating the claims of potential new Afghan clients who may be affected by the Removal Plan; and corresponding with other non-profit organizations to better understand the Removal Plan and formulate strategies to protect Afghan nationals. I have directed the Removal Plan Response Team to do this work, even though it has taken them away from other obligations, including obligations that generate funding for our organization.

64. I have spent significant time responding to the Removal Plan. This work includes managing the Removal Plan Response Team; setting strategy and providing direction; drafting and reviewing legal filings; and corresponding with stakeholders who are important to our efforts, including other non-profits. This work has taken me away from my other duties to the organization, which include community outreach; meeting with clients; supervising staff; and managing my own caseload. This project has also taken away from time that I spend performing other obligations at Project Rousseau, such as teaching and tutoring in our academic programs, mentoring students applying to independent schools, college, and graduate schools during the peak of the application

season, writing letters of recommendation, engaging with stakeholders, pursuing strategic initiatives, and building and strengthening our partnerships. I have had to reschedule numerous meetings unrelated to the Removal Plan due to the Removal Plan.

65. One of Project Rousseau's Staff Attorneys has spent significant time responding to the Removal Plan. For instance, she has taken on additional *habeas corpus* engagements for Afghan clients, and she has drafted emergency filings in cases for existing Afghan National clients. This has taken her away from other tasks, which include *habeas corpus* and bond hearing engagements that would generate revenue for our organization, as well as representations in Immigration Court and Family Court that would generate revenue for our organization.

66. One of Project Rousseau's paralegals has spent significant time responding to the Removal Plan. For example, she has spent significant time tracking the Afghan Nationals' locations and movements between detention centers. This has taken her away from her typical obligations to the organization, which include working with attorneys, representatives and clients to prepare clients for their Individual Merits hearings; preparing intake forms for attorney review for Project Rousseau clients eligible to adjust status through I-485 Application to Register Permanent Residence or Adjust Status having been granted asylum over one-year ago; and providing Dari and/or Pashto interpretation for other Project Rousseau attorneys and representatives.

67. Another one of Project Rousseau's paralegals, a Senior Paralegal, has spent significant time responding to the Removal Plan. This has taken her away from her typical obligations to the organization, which includes supporting attorneys who do not work

with the Afghan Nationals, performing office management tasks, managing interns and part-time workers, and performing clerical work.

68. One of Project Rousseau's DOJ Accredited Representatives has spent significant time responding to the Removal Plan. For example, she has stayed in consistent communication with the families and sponsors of the Afghan Nationals as updates to the Removal Plan have come to light, placed calls to ICE detention facilities to inquire about the whereabouts of the Afghan Nationals, and supported with proofing and editing documents in litigation relating to the Removal Plan. This has taken her away from her typical obligations to the organization, which include preparing Project Rousseau clients who are not the Afghan Nationals for their court hearings, representing clients who are not the Afghan Nationals in Immigration Court, and integrating young clients and families into Project Rousseau's social services and programming.

69. The part-time worker on the Removal Plan Response Team has spent significant time responding to the Removal Plan. This has taken her away from other obligations that she would perform for the organization, such as assisting attorneys and representatives prepare filings for Project Rousseau clients who are not the Afghan Nationals; assisting with hearing preparation for clients who are not the Afghan Nationals; and supporting Project Rousseau's youth services and family programming.

70. Project Rousseau has also experienced an influx of requests in recent weeks from Afghan nationals – other than those named in this case – who are subject to final orders of removal to Afghanistan. Because of the Removal Plan, Project Rousseau has taken on some of these individuals as clients, despite the facts that (i) these clients do not generate

funding for the organization and (ii) our attorneys and staff are already shifting their typical responsibilities to respond to the Removal Plan.

71. Even where these individuals are not ultimately engaged as clients, Project Rousseau's legal team has spent and continues to spend time evaluating potential Afghan clients' claims and corresponding with potential clients.

72. The Removal Plan has frustrated Project Rousseau's ability to prepare for the Afghan Nationals' removal.

73. When a client is due to be removed, Project Rousseau will help that individual coordinate with friends, family, and humanitarian aid workers to minimize risk to their safety and help facilitate their arrival.

74. Because Project Rousseau does not have any specific details concerning the Afghan Nationals' removal to Pakistan (*e.g.*, whether Pakistan will take custody of them, how long they will be in Pakistan, and whether they will be turned over to the Taliban), it has been very difficult to plan for their removal.

75. Project Rousseau continues to assist clients *pro bono* after they are removed, such as helping the client to recover documents retained by ICE.

76. If the client still has proceedings pending in the United States after they are removed (either before an immigration court, the BIA, or a federal court), Project Rousseau continues to litigate their claims *pro bono*.

77. When a client is removed, and particularly where Project Rousseau continues to represent them in ongoing legal proceedings, it is imperative that Project Rousseau is able to retain contact with that client.

78. If the Afghan Nationals are removed to Pakistan, I believe that their lives and safety will be at risk, and I may lose contact with them. If that happens, it will be difficult if not impossible to litigate their matters that remain pending in United States courts.

***Details About the Afghan Nationals***

79. I am knowledgeable about the Afghan Nationals' individual cases. I offer the following based on information that I have learned in my capacity as Supervising Attorney:

80. **Plaintiff Jane Doe 1** is a ~27 year-old Afghan Christian woman who fled Afghanistan because of a well-founded fear of persecution based on her Hazara ethnicity, her Christian faith, and her political opinion. She is a baptized Christian who does not wear the hijab and has numerous permanent tattoos, which are forbidden under Islamic law. She worked as a journalist at the Hamsada Radio Network from January 2019 to August 2021. At Hamsada Radio Network, she covered a variety of topics, including local news in Kabul and Takhar provinces, politics, peace and security, and women and girls.[15] She has been held in ICE custody since she entered the United States in April 2025. Her I-589 Application for Asylum, Withholding of Removal, and Protection under the Convention Against Torture was pretermitted on December 5, 2025, and she was ordered removed on that date. That order has been administratively final since January 5, 2026. She is currently detained in Louisiana. She has an action for *habeas corpus*, which has been pending since July 28, 2026. On August 28, 2026, she learned, through her *habeas corpus* action, that she had been accepted by the Central African Republic. But she has

---

[15] Jane Doe 1 worked as a journalist at the Hamsada Radio Network from January 2019 to August 2021. At Hamsada Radio Network, she covered a variety of topics, including local news in Kabul and Takhar provinces, politics, peace and security, and women and girls. In 2019, two other journalists from the Hamsada Radio Network were murdered by the Taliban. *See Two Radio Journalists Shot and Killed in Northern Afghanistan*, COMMITTEE TO PROTECT JOURNALISTS (Feb. 6, 2019), https://cpj.org/2019/02/two-radio-journalists-shot-and-killed-in-northern/.

not been removed to the Central African Republic. Then, on October 29, 2026, she learned, through her *habeas corpus* action, that she had been "tentatively scheduled . . . for removal from the United States to Afghanistan within the next five days" – *i.e.*, by November 3, 2026. *See* Exhibit A, Jane Doe 1 October 29, 2026 Advisory (Redacted). On November 2, 2026, Jane Doe 1 filed a motion to reopen her immigration proceedings with the Immigration Court, as well as a motion for an emergency stay of her removal order. On November 3, 2026, the Magistrate Judge in her *habeas corpus* action recommended that the Court grant the Petition and order her release. The government filed objections to that recommendation on November 17, 2026. Plaintiff Jane Doe 1 has not been removed from the United States or released from custody to date.

81. **Plaintiff John Doe 1** is a Hazara Shia Muslim and citizen of Afghanistan. Taliban members beat John Doe 1 with rifle butts and pipes as he prepared to observe Arba'in, a Shia religious holiday. Following the Taliban's takeover in 2021, John Doe 1 fled Afghanistan in fear for his life because of his Hazara ethnicity, Shia faith, and ties to the former Western-backed Afghan government. Before the Taliban takeover, John Doe 1 worked as an engineer for companies holding government contracts. He entered the United States in January 2025, and he has been detained since he entered. He subsequently filed a timely I-589 Application for Asylum, Withholding of Removal, and Protection under the Convention Against Torture. His applications for relief were denied on July 18, 2025, and his appeal to the BIA was dismissed on January 14, 2026. He is currently detained in Texas. He filed an action for *habeas corpus* on July 17, 2026, which is pending. On or around October 22, 2026, Plaintiff John Doe 1 was informed by an ICE officer that he would be removed from the United States during the first or second

week of November 2026. On or around October 30, 2026, in the early morning hours, John Doe 1 and about nine other Afghans were taken from their detention center in Texas, brought to a location that was ostensibly an airport, and returned to detention in Texas that same day. It appears that Plaintiff John Doe 1 was being "staged" for removal, but he was not informed of his intended destination or the reason that the removal mission was not executed. Plaintiff John Doe 1 has not been removed from the United States or released from custody to date.

82. **Plaintiff John Doe 2** is a Hazara Shia Muslim and citizen of Afghanistan who has had two brothers killed by the Taliban. Following the Taliban's takeover in 2021, John Doe 2 fled in fear for his life because of his Hazara ethnicity, Shia faith, and his family's ties to the former Western-backed Afghan government and allied international forces. One of his brothers had worked for a construction company holding contracts with the former Afghan government and allied forces. In the weeks leading up to his flight from Afghanistan, Taliban members raided John Doe 2's home and beat him twice. He entered the United States in July 2024, and he has been detained since his entry. He subsequently filed a timely I-589 Application for Asylum, Withholding of Removal, and Protection under the Convention Against Torture. His applications for relief were denied on February 3, 2025, and he was ordered removed on that date. He filed an action for *habeas corpus* on April 7, 2026, and that case is pending. Plaintiff is currently detained in Texas. Plaintiff was among the group of ~10 Afghans who were taken on or around October 30, 2026 from their detention center in Texas, brought to a location that was ostensibly an airport, and returned to detention in Texas that same day for apparent removal "staging." On November 3, 2026, John Doe 2 filed a motion to reopen his

immigration proceedings with the Immigration Court, as well as a motion for an emergency stay of his removal order. Plaintiff John Doe 2 has not been removed from the United States or released from custody to date.

83. **Plaintiff John Doe 3** is a male citizen and national of Afghanistan. Following the Taliban's takeover in 2021, John Doe 3 fled Afghanistan in fear for his life because of his Hazara ethnicity, Shia faith, and multiple visible tattoos. Taliban members had previously harmed John Doe 3 with a knife, attempting to carve the tattoos from his skin. He entered the United States in December 2024 and was detained upon entry. He filed a timely I-589 Application for Asylum, Withholding of Removal, and Protection under the Convention Against Torture. He was ordered removed on June 17, 2025, and his appeal to the BIA was dismissed on January 9, 2026. He brought an action for *habeas corpus*, and the Court ordered his release from custody on August 28, 2026, on the ground that his detention had become unconstitutionally prolonged. He was re-detained on October 27, 2026 at an ICE check-in in California. At that check-in, he was provided with a document stating that he would be removed to Afghanistan on or before November 25, 2026. His counsel subsequently filed a motion to enforce the District Court's judgment ordering his release, and that motion is pending. He is currently detained in Louisiana. Plaintiff John Doe 3 has not been removed from the United States to date.

84. **Plaintiff Jane Doe 2** is a female citizen and national of Afghanistan. She fled Afghanistan following the Taliban takeover, fearing for her life due to her Hazara ethnicity and her Christian faith. Jane Doe 2's brother was imprisoned and tortured by the Taliban because he is a Christian convert. She entered the United States in August 2025, and she has been detained since her entry. Her I-589 Application for Asylum,

Withholding of Removal, and Protection under the Convention Against Torture was denied on November 6, 2025, and she was ordered removed on that date. She filed a Motion to Reopen on December 3, 2025, and it was denied. An appeal of the denial was filed with the BIA on January 2, 2026, and remains pending. An emergency motion for a stay of removal was filed with the BIA on November 3, 2026. Plaintiff Jane Doe 2 was among the group of Afghans who, alongside John Doe 1 and John Doe 2, were taken on or around October 30, 2026 from their detention center in Texas, brought to a location that was ostensibly an airport, and returned to detention in Texas that same day for apparent removal "staging." She is currently detained in Texas. Plaintiff Jane Doe 2 has not been removed from the United States or released from custody to date.

85. **Plaintiff John Doe 4** is a male citizen and national of Afghanistan. He fled Afghanistan following the Taliban takeover, fearing for his life because he had worked as a telecommunications assistant at a company that had contracted with the United States Department of Defense in Afghanistan. He entered the United States in November 2025, and he was detained upon entry. He received a negative "credible fear" determination. That finding was affirmed by an Immigration Judge, and he was ordered removed on December 19, 2024. Plaintiff John Doe 4 filed an action for *habeas corpus*, and the District Judge ordered his release pursuant to *Zadvydas*, 553 U.S. 678, on July 15, 2026. Plaintiff was re-detained on October 15, 2026 at an ICE check-in in Virginia and served with a document stating that his removal was scheduled to take place "no later than" November 3, 2026. Upon his re-detention, Petitioner was transferred to a detention center in Louisiana, where he remains in custody. On November 6, 2026, he filed a

motion to enforce the District Court's judgment ordering his release, and that motion is pending. Plaintiff John Doe 4 has not been removed from the United States to date.

86. To my knowledge, each of the Afghan Nationals remains in ICE custody.

87. To my knowledge, none of the Afghan Nationals has been removed from the United States.

88. On November 4, 2026, one of the Afghan Nationals was informed by an ICE Detention and Deportation Officer in a sworn declaration that the government did not have a plan to remove that individual to Pakistan, and that no such plan ever existed.

89. The Afghan Nationals did not receive any notice that Pakistan, government officials of Pakistan, or private contractors hired by the Pakistan government will coordinate their onward transport to Afghanistan.

90. The Afghan Nationals did not receive any information concerning how they would be transported between Pakistan and the Taliban, nor when or by whom.

91. The Afghan Nationals did not receive information concerning whether they would be liberated in Pakistan or whether they would remain in Pakistani custody and confinement, or even under the custody and confinement of a private contractor sub-contracted by the Government of Pakistan.

92. Outside of this lawsuit, the Afghan Nationals have not had an opportunity to challenge their "coordinated" removal to Pakistan.

93. Outside of this lawsuit, the Afghan Nationals have not had an opportunity to be heard on their concerns about the dangers involved in their "coordinated" removal.

94. The Afghan Nationals have not been provided with a definition of "coordinated" removal, what it entails, by whom they will be held in Pakistan, or even that they are actually going to Pakistan at all.

95. The Afghan Nationals were not put on notice that they may be removed to Pakistan, or removed to their country of origin via the United States Government's "coordination" with Pakistan, during their removal proceedings.

96. The Afghan Nationals have not appeared before an immigration officer, USCIS, or an Immigration Judge for a screening for eligibility for protection under INA § 241(b)(3) and the Convention Against Torture ("CAT") with respect to their fear of being removed to Pakistan.

97. The Afghan Nationals have not received individualized hearings with respect to their fear of being removed to Pakistan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Dated: November 17, 2026

*/s/ Andrew Heinrich*
Andrew Heinrich
*Supervising Attorney*
Project Rousseau, Inc.
1560 Broadway, Suite 805
New York, NY 10036
Email: Andrew.Heinrich@projectrousseau.org
Phone: +1 (917) 734-7219